Karra J. Porter, 5223
Karra.Porter@chrisjen.com
Nathan D. Alder, 7126
Nathan.Alder@chrisjen.com
Sarah E. Spencer, 11141
Sarah.Spencer@chrisjen.com
CHRISTENSEN & JENSEN, P.C.
15 West South Temple, Suite 800
Salt Lake City, Utah  84101
Telephone:  (801) 323-5000
Facsimile:  (801) 355-3472
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| ANNA SCHMIDT CARDALL, individually, as personal representative of the estate of BRIAN LAYTON CARDALL, and as guardian of AVA CARDALL and BELLA CARDALL, DUANE CARDALL, individually, and MARGARET CARDALL, individually, <br><br> **Plaintiffs**, <br><br> vs. <br><br> KENNETH THOMPSON, in his individual capacity, LYNN EXCELL, in his individual capacity, and HURRICANE CITY, a Utah Municipal Corporation, and JOHN and JANE DOE, <br><br> **Defendants**. | **COMPLAINT** <br><br> **AND** <br><br> **JURY DEMAND** |

Plaintiffs, by and through their undersigned counsel of record, hereby complain against

Defendants, demand a jury trial, and assert the following allegations in their totality and in the

alternative:

**PARTIES AND OTHER INTERESTED PERSONS**

1.      Plaintiff Anna Schmidt Cardall ("Anna") is the lawful and natural guardian of minor Plaintiffs Ava Cardall and Bella Cardall, surviving children of Brian Layton Cardall ("Brian"), and the surviving spouse and personal representative of the estate of Brian Layton Cardall.  Anna Schmidt Cardall was, at all relevant times, a resident of Coconino County, State of Arizona.

2.      Plaintiffs Duane Cardall ("Duane") and Margaret Cardall ("Margaret") are the parents of decedent Brian Cardall.  Duane and Margaret are, and were at all relevant times, residents of Salt Lake County, State of Utah.

3.      Defendant Hurricane City is a political subdivision of the State of Utah.

4.      At all relevant times, Defendant Kenneth Thompson was a police officer with the Hurricane City Police Department.  Defendant Thompson is being sued in his individual capacity.

5.      At all relevant times, Defendant Lynn Excell was the Chief of Police of the Hurricane City Police Department.  Defendant Excell is being sued in his individual capacity.  At all relevant times, Defendant Excell had and/or was a policy making authority with respect to the subject matter at issue in this Complaint.

6.      Defendants John and Jane Doe are persons whose names are unknown at this time, and who might have caused or contributed to the actions of the named Defendants.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

2

8.     Venue is proper in this Court under 28 U.S.C. § 1391.  At all relevant times, Defendants were residents of Washington County, State of Utah, and all of the events of which Plaintiffs complain took place in Washington County, State of Utah.

## GENERAL ALLEGATIONS

9.     Decedent Brian Layton Cardall was the husband of Anna Schmidt Cardall, the father of Ava Cardall, and son of Duane and Margaret Cardall.  In June of 2009, Anna was pregnant with the Cardalls' second child, Bella Cardall.

10.     In addition to being a loving husband and father, Brian was also a dedicated student.  As of June of 2009, Brian was working on his Ph.D. in biology at Northern Arizona University and was nearing completion of his dissertation.

11.     On June 9, 2009, Brian was driving through Washington County, Utah, with Anna and Ava.  Brian and Anna had attended a wedding with family in Salt Lake City, and they were driving back to their home in Flagstaff, Arizona.

12.     On the way home, Anna noticed that Brian started to act out of the ordinary. Anna and Brian stopped the vehicle in a designated pull-out area so that Brian could take some medication.

13.     A psychiatrist had previously diagnosed Brian with bipolar disorder and prescribed Seroquel, a medication that Brian took infrequently for symptoms of that disorder.

14.     Anna and Brian parked and exited the vehicle in a large, designated pull-out area along State Road 59.  Brian and Anna left Ava inside the car.

15.     Anna gave Brian some of the medication.  Brian took the medication, but Anna knew it would not take effect immediately.  Brian started to become upset, and began removing

3

articles of his clothing.  Anna tried to ask Brian to settle down and wait for the medication, but Brian was not able to process what she was saying.  Brian started to go into the roadway.

16.     Although Anna noticed that it was not a particularly busy time of day, she was still worried that Brian might get hit by a car if he kept going in the roadway.  Anna called 911 because she knew that it would take up to an hour for the medication to take effect and she needed help to prevent her husband from being harmed.

17.     Also on June 9, 2009, Defendant Thompson was working for the Hurricane City Police Department as a school resource officer.  However, because it was summer and school was out, Defendant Thompson was on patrol in a police vehicle instead of working at his usual post at a local school.

18.     At approximately 1:09 p.m. on June 9, 2009, Defendant Thompson and Defendant Excell were both notified by dispatch that a male individual was experiencing a psychiatric disturbance at approximately mile marker 18 on State Road 59 in Washington County, Utah.

19.     The male individual reported by dispatch to Defendant Thompson and Defendant Excell was decedent Brian Cardall.

20.     Defendant Thompson drove toward the location reported by the dispatcher by heading south on State Road 59 from Hurricane.

21.     As he drove to the reported location, dispatch told Defendant Thompson that:

    a.  Washington County Sheriff's deputies were en route to the location;

    b.  the male was bi-polar;

    c.  the male had taken medication for his condition but it had not yet taken effect;

    d.  the male was going in the road and jumping in front of cars;

4

    e.   the male was taking his clothes off;

    f.   the male's wife was on the line with dispatch;

    g.   the male was trying to get in a stopped vehicle;

    h.   the male's wife did not want him back in their vehicle because of the presence of a two-year-old;

    i.   the male was talking about meeting with the president; and,

    j.   the male was trying to direct traffic.

22.    As Defendant Thompson was driving toward the location, he observed that Defendant Excell was traveling behind him also en route to the reported location.

23.    Both Defendants were "running code," meaning their lights and sirens were activated while heading toward the location.  Neither vehicle had video dash cameras installed.  Defendant Thompson's audio recording device had been activated during a prior encounter that afternoon and remained on throughout the incident involving the Cardalls.

24.    At approximately 1:13 p.m., Defendant Thompson and Defendant Excell reached Hurricane City limits.  Although they knew that County deputies were en route to the scene, they elected to proceed past the city limits on southbound State Road 59.

25.    As Defendant Thompson came around a bend in southbound State Road 59 located approximately .6 miles south of milepost 16, he passed the location where Brian and Anna Cardall were stopped along side the road.

26.    When Defendant Thompson passed by the area, he observed Brian and Anna standing outside of their parked vehicle.

5

27.    The Cardalls' vehicle was lawfully stopped in a designated vehicle pull-out area located on the south side of State Road 59 approximately .6 miles south of milepost 16.

28.    As Defendant Thompson passed the location, he observed that Brian was now fully naked and was standing in the pull-out area.

29.    At the time of Defendant Thompson's arrival, Brian was no longer on the roadway nor moving toward the roadway.

30.    The pull-out area consists of dirt and gravel.  It extends approximately 75 feet from the south side of where the asphalt ends on State Road 59 toward a barbed wire fence.

31.    The vehicular traffic along southbound State Road 59 was light during all relevant times.  It was not rush hour, and was not a particularly busy time of day for vehicles in that area.

32.    Defendant Thompson stopped his vehicle immediately past the location where the Cardall vehicle was stopped, and then positioned his vehicle to face the location where Brian and Anna were standing.

33.    Defendant Excell stopped his police vehicle prior to (west of) the location where the Cardall vehicle was stopped and where the Cardalls were standing.

34.    Defendant Thompson exited his police vehicle at approximately 1:18 p.m.

35.    At the time Defendant Thompson exited his vehicle, Defendant Excell was already out of his police vehicle and was standing to the west of where Brian and Anna were standing.

36.    When Defendant Thompson exited his vehicle, Brian was standing in the middle of a triangle created by the three vehicles on scene, Defendant Thompson's, Defendant Excell's, and the Cardalls' vehicles.

37.     Defendant Thompson was carrying an X26 Taser.

38.     An X26 Taser is a type of weapon known as an electronic control device.   The X26 Taser device utilizes compressed nitrogen to project two small probes up to various distances at a speed of over 160 feet per second.   These probes are connected to the Taser device by insulated wire.   An electrical signal is transmitted through the wires to where the probes make contact with the body, resulting in an immediate loss of the person's neuromuscular control and the ability to perform coordinated action for the duration of the impulse.   The X26 Taser delivers up to 50,000 volts of electricity to its target.

39.     Immediately upon exiting the vehicle, Defendant Thompson drew his Taser and pointed it at Brian.   Defendant Thompson simultaneously screamed the conflicting instructions, "Come here!" and "Get on the ground!"

40.     At no time before drawing his Taser or at any time during the ensuing incident did Defendant Thompson attempt to engage Brian in a dialogue.

41.     When Defendant Thompson screamed at Brian to "come here" and "get on the ground," Brian immediately put his empty hands in the air by his head.

42.     Brian did not have any weapons or other materials in his hands.

43.     Brian's hands were at all relevant times completely visible to Defendants Thompson and Excell.

44.     Defendants Thompson and Excell knew that Brian did not have any weapons on his person.

45.     Knowing that Brian would have to kneel on sharp gravel, and that Brian had no protective clothing on his legs, nonetheless, Defendant Thompson continued to scream, "Get on the ground!"

46.     Brian said "She's safe!" referring to his wife, Anna, and then said, "I'm ok, she's safe!"

47.     Brian told Defendant Thompson, "This is a standoff, don't shoot it!"

48.     It appeared at that time to Defendant Thompson that Brian was expressing concern that Defendant Thompson might shoot Defendant Excell.

49.     Brian pleaded with Defendant Thompson, "This is a standoff!  Don't shoot me, man!"

50.     According to Defendant Thompson, during this exchange, Brian would take a couple of steps toward Defendant Excell, then a couple of steps back toward Anna, and then a couple of steps back toward Defendant Thompson.

51.     Brian never made any aggressive or threatening movements toward Defendant Thompson, Defendant Excell, or Anna.

52.     On June 9, 2009, Brian had a thin build, weighing approximately 156 lbs and standing approximately 6 feet tall.

53.     On June 9, 2009, Defendant Thompson was larger than Brian, weighing more than 200 lbs.

54.     On June 9, 2009, Defendant Excell was larger than Brian, weighing more than 200 lbs.

55.     Defendants Thompson and Excell knew that additional law enforcement officers were continuing to the scene and would be there shortly.

56.     When Defendant Thompson screamed again, "Get on the ground," Brian got down on one knee, and then stood up again.

57.     Brian then took, at most, one step in the direction of Defendant Thompson.

58.     At that moment, Brian was not moving his body toward the road, and was in no danger of going into the roadway.

59.     Without any warning, Defendant Thompson shot Brian with his X26 Taser.

60.     Defendant Thompson waited only forty-two (42) seconds from when he exited his vehicle before shooting Brian with the Taser.

61.     Eyewitness Lorry Stratton was driving southbound on State Road 59 at the time Defendant Thompson shot Brian with the Taser.

62.     Mr. Stratton observed that:

        a.   Defendant Thompson was 10 to 12 feet east of a naked man, Brian;

        b.   Brian took only one step towards Defendant Thompson;

        c.   Thompson tasered Brian;

        d.   Brian then fell immediately to the ground on his back.

63.     The two barbs from Defendant Thompson's Taser penetrated deeply into Brian's naked torso, one in Brian's upper-left shoulder and the other on the left chest just below the nipple.

64.     The two Taser probes crossed directly over Brian's heart.

65.     The first Taser cycle was the full five seconds.

9

66.     During the first Taser cycle, Brian remained on the ground.

67.     Neither Defendant Thompson nor Defendant Excell made any attempt to take Brian into custody during or at the conclusion of the first Taser cycle.

68.     Brian was breathing and moaning during and after the first Taser cycle.

69.     After the first five-second Taser cycle ended, Brian made a slight movement but remained lying on the ground.

70.     When Brian moved, Defendant Thompson then intentionally shot Brian a second time with another Taser charge.  Defendant Thompson waited only two (2) seconds after the first cycle ended before shooting Brian again.

71.     The two-second interval between the first and second Taser cycles was confirmed by later analysis performed by the Federal Bureau of Investigation.

72.     Defendant Thompson did not give Brian any verbal commands between the time the first Taser cycle ended and when he pulled the Taser's trigger again a short two seconds later.

73.     When Defendant Thompson deployed his Taser for the second time, Brian was still lying on the ground.  At that time, Brian posed no threat to Defendant Thompson, Defendant Excell, or Anna.

74.     The second Taser cycle was another full five-second cycle.

75.     Defendant Thompson had the ability to terminate either cycle before the full five seconds, and he chose not to do so.

76.     Only after Defendant Thompson engaged the second cycle of the Taser on Brian did Defendant Thompson give the verbal command, "Stay on the ground!"

77.     After the second five-second Taser cycle ended, Defendant Excell rolled Brian face down into the gravel, and pulled Brian's arms behind his back to handcuff him.  In so doing, Defendant Excell jammed his knee into Brian's upper back.

78.     After the deployment of the Taser, Defendants Thompson and Excell observed and appreciated the fact that both of the Taser's barbs had penetrated Brian's naked chest immediately over his heart.

79.     After Defendant Excell handcuffed Brian, Defendants left him face down and naked in the dirt and gravel without checking his vital signs or whether he was breathing.

80.     Defendant Thompson had been trained that the purpose of the first Taser cycle is to immobilize the subject allowing the officer to take the person into custody.

81.     Defendant Thompson and Defendant Excell could have physically taken Brian into custody at or before the conclusion of the first Taser cycle.

82.     Although Defendant Thompson was carrying a can of Oleoresin Capsicum spray (pepper spray), Defendant Thompson never attempted to detain Brian with the pepper spray prior to tasing Brian for the first time or between the two cycles.

83.     Despite being physically able to do so, despite the fact that two officers were present, and despite the fact that Defendant Thompson knew that Brian had no weapons, Defendant Thompson never attempted to use his hands, or any lesser means of force to detain Brian, before tasing Brian for the first time, or between the two cycles.

84.     Defendant Excell watched Defendant Thompson shoot Brian without provocation and without warning, and at no time during the incident did Defendant Excell tell Defendant Thompson to stop, end the cycle or not shoot again.

11

85.     Defendant Excell did not instruct Defendant Thompson to use his pepper spray or his hands in order to detain Brian before the first tasing or before the second cycle.

86.     A significant portion of the adult population in the United States has bipolar disorder or related conditions.   Moreover, an additional significant portion of the adult population in the United States has mental disorders or illnesses that can cause non-threatening, but abnormal, behavior.

87.     Law enforcement training relating to mentally ill subjects was readily available to Hurricane City.   For example, the Salt Lake City Police Department had regularly provided training in association with the National Association for Mental Illness (NAMI).   For at least eight years in a row, Hurricane City and Defendant Excell declined to send any officers to such training.

88.     Hurricane City and Defendant Excell knew, and/or it was obvious, that their failure to provide adequate training on dealing with mental illness was substantially certain to result in a constitutional violation but consciously and deliberately chose to disregard the risk of that harm.

89.     Defendant Excell knew, and/or it was obvious, that his failure to supervise Defendant Thompson was substantially certain to result in a constitutional violation but Defendant Excell consciously and deliberately chose to disregard the risk of that harm.

90.     Brian suffered numerous cuts and abrasions to his face and torso as a result of falling to the ground while being tased, and as a result of Defendants rolling him on the dirt and gravel in order to effectuate the handcuffing.

91.    After Brian was handcuffed, Defendant Thompson radioed to awaiting paramedics and told them they were "cleared to enter."  Defendant Thompson did not tell the paramedics that Brian was unresponsive.

92.    Anna expressed concern about whether Brian was all right.  Nonetheless, Defendants Thompson and Excell made no attempt to determine whether Brian was breathing or had a pulse.

93.    Instead, as Brian lay face down, unresponsive, with no medical attention, Defendant Thompson ignored him and ordered Anna to return to her vehicle, preventing Anna from attending to her husband.  Defendant Thompson followed her to her vehicle in order to interrogate her about Brian's psychiatric condition.

94.    As Defendant Thompson spoke to Anna, but before paramedics arrived, Officer Jeff Adams from the Hurricane City Police Department arrived on scene and parked his car in front of (east of) Defendant Thompson's vehicle.

95.    Officer Adams noticed that Brian was naked as he passed by the scene, so he grabbed a blanket from his police vehicle before exiting the vehicle and heading toward Brian.

96.    Officer Adams covered Brian with the blanket.  At that time, he noticed that Brian's chest was not moving, that Brian did not appear to be breathing normally, and that Brian's lips had already turned blue.

97.    Officer Adams alerted Defendant Excell that Brian was not breathing.

98.    After Officer Adams told Defendant Excell that Brian was not breathing normally, Defendant Excell also noticed that Brian's lips were blue.

99.    Defendant Excell then checked Brian's pulse for the first time, and found that Brian had no pulse.

100.    Despite having actual knowledge that the Taser's prongs penetrated Brian's naked body directly over Brian's heart, and despite observing obvious signs of cardiac arrest, including seeing Brian's blue lips, realizing that Brian was not breathing and/or gasping for breath, and finding no pulse, neither Defendant Excell nor Defendant Thompson did anything to help Brian during those critical minutes before paramedics arrived.  For example:

    a.  Neither Defendant Thompson nor Defendant Excell checked Brian's airway.

    b.  Defendant Thompson and Defendant Excell left Brian handcuffed.

    c.  Defendant Thompson and Defendant Excell did not turn Brian over onto his side or back so that he could breathe more easily, but instead they left him face down.

    d.  Neither Defendant Thompson nor Defendant Excell commenced cardio pulmonary resuscitation ("CPR") on Brian.

101.    Approximately two or more minutes after the second tasing cycle ended, during which time Brian was suffering cardiac arrest and Defendants did nothing to help, paramedics arrived on the scene.

102.    Upon arrival at the scene, paramedics saw that Brian was still face down in the dirt and gravel.

103.    Paramedics asked Defendant Excell to remove Brian's handcuffs and turn him over onto his back.

14

104.    When paramedics evaluated Brian, they immediately observed and stated that Brian was exhibiting "agonal breathing."

105.    Agonal breathing is an abnormal pattern of respiration characterized by shallow, slow, gasping, irregular inspirations followed by long pauses.  Agonal respiration is a well-known marker of the early phase of cardiac arrest, and is exhibited in over half of persons suffering from a heart attack.

106.    The Utah EMS Incident Report, filed by Hurricane Fire & Rescue with the Bureau of Emergency Medical Services in the Utah Department of Health, states that Brian suffered cardiac arrest prior to paramedic arrival on scene.

107.    If Defendant Hurricane City and Defendant Excell had trained Hurricane City officers to check on the medical status of persons they had tased (particularly a subject who had been handcuffed), and/or if they had in fact checked Brian's medical status, Defendant Thompson and Defendant Excell would have taken steps to save Brian Cardall's life, such as commencing CPR.

108.    After paramedics recognized that Brian was suffering from a cardiac arrest, an EMT called out, "Need a bag! Ambu bag!"

109.    The paramedics then stated Brian had "no pulse at all."

110.    Paramedics then applied a defibrillator to Brian, which showed that his heart rhythm was ventricular fibrillation.

111.    Ventricular fibrillation is an abnormal rhythm indicating cardiac arrest which can sometimes be corrected with the application of a defibrillator.

112.    The paramedics cleared the area, and delivered the shock to Brian's heart with the defibrillator.  The first shock did not return Brian's heart to a normal rhythm.

113.    Paramedics then commenced CPR on Brian, and loaded him into the ambulance.

114.    While en route to the hospital, paramedics continued CPR and administered intravenous medications to Brian.

115.    Brian's heart rhythm upon being loaded in the ambulance was asystole, commonly known as a "flat line."

116.    During the ambulance ride, Brian's heart rhythm alternated between flat-line and pulseless electrical activity (PEA), which is a state of electrical activity in the heart without contraction of the heart muscle.

117.    Brian's heart rhythm never returned to a normal rhythm, ventricular fibrillation or any other shockable rhythm during the ambulance ride.  Despite this, the paramedics attempted further administrations of the defibrillator, but they were unsuccessful in returning Brian's heart to a normal rhythm.  Brian never regained a pulse.

118.    Brian was pronounced dead at Dixie Regional Medical Center at 2:19 p.m. on June 9, 2009.

119.    Following Defendant Thompson's interrogation of Anna Cardall at the scene, at the direction or instruction of Defendant Thompson and/or Defendant Excell, or on behalf and with the knowledge of, and in concert with Defendant Thompson and/or Defendant Excell and/or Hurricane City, other law enforcement officers took Anna into custody.

120.    Anna was commanded to drive her own vehicle from the scene to the jail in Hurricane at the same time that Brian was en route to the hospital in the ambulance.

16

121.    Anna was held in an interrogation room at the jail facility and was not allowed to leave, even when she asked permission to get a clean diaper for her daughter from her car in the parking lot.  She was not allowed to go to the hospital to be with her husband.  She was not allowed to speak with Brian's uncle, who had come to the jail to be with her.

122.    Anna was detained for a lengthy period of time, and despite her requests for information, she was not informed regarding her husband's condition.  Anna was finally interrogated by law enforcement officers, after which a deputy informed her that her husband was dead.  Only then was Anna released from custody to go to the hospital.

123.    Anna Cardall was never suspected of having committed any criminal offense.

124.    There was no probable cause to detain Anna Cardall for any reason.

125.    On November 6, 2009, Assistant Utah State Medical Examiner Erik D. Christensen, M.D., issued his Report of Examination of Brian Cardall, concluding that Brian's cause of death was "ventricular fibrillation following conducted energy weapon (CEW) deployment during a manic episode with psychotic features."

126.    Some or all of the actions of Defendant Thompson and Defendant Excell were the result of willful and malicious conduct, and/or manifested a knowing and reckless indifference toward, and a disregard of, the rights of others.

## CAUSES OF ACTION

127.    The headings stated under each individual cause of action are for general descriptive purposes only, and are not intended to limit the Cardalls' causes of action.  The Cardalls reserve the right to assert any legal theory or cause of action applicable to the facts set forth in this Complaint pursuant to F.R.Civ.P. 8.

128.    The causes of action asserted herein are asserted individually and/or in the alternative.

### FIRST CAUSE OF ACTION

42 U.S.C. § 1983 – Deprivation of Constitutional Rights – Defendant Thompson

129.    Plaintiffs incorporate by reference all other paragraphs of this Complaint, as if fully set forth herein.

130.    At all relevant times, Defendant Thompson was employed as a police officer with the Hurricane City Police Department.

131.    At all times relevant hereto and in performance of the acts set forth herein, Defendant Thompson acted under color of state law.

132.    At all times relevant hereto and in performance of the acts set forth herein, Defendant Thompson actively and personally caused the violations of Brian Cardall's constitutional rights.

133.    Defendant Thompson's conduct as alleged herein subjected Brian Cardall to the deprivation of his rights protected under the Fourth and Fourteenth Amendments to the United States Constitution.

134.    Defendant Thompson used excessive force against Brian Cardall without justification, and deprived Brian Cardall of his liberty without due process of law.

135.    Defendant Thompson should have been trained in methods to achieve law enforcement objectives without inflicting injury and violating constitutional rights.

136.    Defendant Thompson's actions as alleged herein manifested malicious, reckless and callous indifference to Brian Cardall's clearly established constitutional rights of which reasonable police officers are aware.

137.    Defendant Thompson's actions as alleged herein further subjected Anna Cardall to the deprivation of her rights protected under the Fourth Amendment to the United States Constitution, in that Defendant Thompson wrongfully instructed other law enforcement officers to seize Anna Cardall, and hold her in police custody, without reasonable suspicion or probable cause of her committing any crime.

138.    Defendant Thompson's actions as alleged herein were the proximate cause of the death of Brian Cardall and the damages sustained by Plaintiffs.

## SECOND CAUSE OF ACTION

42 U.S.C. § 1983 – Deprivation of Constitutional Rights – Defendant Excell

139.    Plaintiffs incorporate by reference all other paragraphs of this Complaint, as if fully set forth herein.

140.    At all relevant times, Defendant Lynn Excell was employed by Hurricane City as the Chief of Police.

141.    At all relevant times and in performance of the acts set forth herein, Defendant Excell acted under color of state law.

142.    At all relevant times and in performance of the acts set forth herein, Defendant Excell actively and personally participated in and caused the violations of Brian Cardall's constitutional rights.

143.    At all relevant times and in performance of the acts set forth herein, Defendant Excell was charged with the duty of supervising Defendant Thompson.

144.    Defendant Excell owed Brian Cardall a duty to protect Brian Cardall from the violations of his constitutional rights committed by Defendant Thompson, who was under the supervision of Defendant Excell.

145.    Defendant Excell's conduct as alleged herein subjected Brian Cardall to the deprivation of his rights protected under the Fourth and Fourteenth Amendments to the United States Constitution, in that Defendant Excell failed to supervise Defendant Thompson to prevent Defendant Thompson's use of excessive force against Brian Cardall and Defendant Thompson's deprivation of Brian Cardall's liberty without due process of law.

146.    Defendant Excell's actions as alleged herein manifested malicious, reckless and callous indifference to Brian Cardall's clearly established constitutional rights of which reasonable police officers are aware.

147.    Defendant Excell's actions as alleged herein further subjected Anna Cardall to the deprivation of her rights protected under the Fourth Amendment to the United States Constitution, in that Defendant Excell wrongfully instructed other law enforcement officers to seize Anna Cardall, and hold her in police custody, without reasonable suspicion or probable cause of her committing any crime.

148.    Defendant Excell's actions as alleged herein were the proximate cause of the death of Brian Cardall and the damages sustained by Plaintiffs.

## THIRD CAUSE OF ACTION

42 U.S.C. § 1983 – Deprivation of Constitutional Rights – Defendant Hurricane City and Defendant Excell

149.    Plaintiffs incorporate by reference all other paragraphs of this Complaint, as if fully set forth herein.

150.    The conduct described herein reflects an established policy, practice, custom, and/or decision, officially adopted or informally accepted or condoned by Hurricane City and its officials and employees, including Chief of Police Defendant Excell, which policy, practice, custom, and/or decision consists of arming police officers with lethal and dangerous weapons such as Tasers without providing proper training and supervision regarding their safe, reasonable, and appropriate use, and without providing proper training regarding how to handle adverse outcomes following the use of lethal and dangerous weapons such as Tasers.

151.    Defendant Hurricane City and Defendant Excell are required to take action to properly train and supervise their employees or agents and prevent their unlawful and unconstitutional actions.

152.    Defendant Hurricane City and Defendant Excell were deliberately indifferent toward the proper training and supervision of their employees and agents.  Defendant Hurricane City and Defendant Excell failed to properly train and supervise their employees and agents.

153.    Defendant Thompson and Defendant Excell engaged in the herein-described conduct pursuant to and as a result of Defendant Hurricane City's and/or Defendant Excell's policy, practice, custom, and/or decision.

154.     The actions of Defendant Hurricane City and Defendant Excell alleged herein involved reckless and callous indifference to Brian Cardall's rights protected under the Fourth and Fourteenth Amendments to the United States Constitution.

155.     The actions of Defendant Hurricane City and Defendant Excell alleged herein further subjected Anna Cardall to the deprivation of her rights protected under the Fourth Amendment to the United States Constitution, in that Hurricane City officials and employees acted pursuant to an established policy, practice, custom, and/or decision, officially adopted or informally accepted or condoned by Hurricane City and its officials and employees, when they wrongfully instructed other law enforcement officers to seize Anna Cardall, and hold her in police custody, without reasonable suspicion or probable cause of her committing any crime.

156.     The actions of Defendant Hurricane City and Defendant Excell as alleged herein were the proximate cause of the death of Brian Cardall and the damages sustained by Plaintiffs.

## FOURTH CAUSE OF ACTION

Violations of Utah Constitution Art. I, §§ 1, 7, 9, & 14 – All Defendants

157.     Plaintiffs incorporate by reference all other paragraphs of this Complaint, as if fully set forth herein.

158.     At all relevant times, Plaintiffs had clearly established liberty interests, rights to be free from unreasonable seizures and unnecessarily rigorous treatment, and other protected interests under Article I, §§ 1, 7, 9, and 14 of the Utah Constitution.

159.     Based upon the text and historical context, and other considerations, the protections and rights afforded by Article I, §§ 1, 7, 9, and 14 are broader than the interests and rights afforded by the United States Constitution.

160. Defendants violated Plaintiffs' rights through the conduct described herein.

161. Defendants' actions alleged herein amount to flagrant violations of the Cardalls' rights under the Utah Constitution.

162. There is no other adequate state law remedy for these violations.

163. Injunctive relief cannot redress Plaintiffs' injuries.

164. Defendants' actions as alleged herein were the proximate cause of the death of Brian Cardall and the damages sustained by Plaintiffs.

## FIFTH CAUSE OF ACTION

Intentional Infliction of Emotional Distress – Defendants Thompson and Excell

165. Plaintiffs incorporate by reference all other paragraphs of this Complaint, as if fully set forth herein.

166. Defendant Thompson's and Defendant Excell's intentional and/or reckless actions as described above constituted outrageous conduct under the circumstances.

167. The actions of Defendants Thompson and Excell offended generally accepted standards of decency and morality.

168. Any reasonable person would have known that the intentional and/or reckless actions of Defendants Thompson and Excell would result in severe emotional distress to Anna Cardall.

169. Anna Cardall has in fact suffered emotional distress.

## SIXTH CAUSE OF ACTION

Willful Misconduct/Wrongful Death – Defendant Thompson

170.     Plaintiffs incorporate by reference all other paragraphs of this Complaint, as if fully set forth herein

171.     Defendant Thompson acted through, or failed to act through, willful misconduct that resulted in the wrongful death of Brian Cardall, by, among other things, acting with the intent to cause an unconsented harmful and/or offensive contact to Brian Cardall.

172.     Defendant Thompson did in fact commit such unconsented harmful and/or offensive contact against Brian that resulted in Brian's death.

## SEVENTH CAUSE OF ACTION

Willful Misconduct/Wrongful Death – Defendant Thompson and Defendant Excell

173.     Plaintiffs incorporate by reference all other paragraphs of this Complaint, as if fully set forth herein.

174.     Defendant Thompson and Defendant Excell acted through, or failed to act through, willful misconduct that resulted in the wrongful death of Brian Cardall.

175.     Such misconduct included, among other things, intentionally and/or recklessly failing and/or refusing to provide any medical assistance to Brian after incapacitating Brian and creating the medical emergency that resulted in his death, and by preventing Anna from attending to Brian after Anna expressed concern that Brian was in danger.

## COMPLIANCE WITH GOVERNMENTAL IMMUNITY ACT OF UTAH

176.     To the extent required, Plaintiffs have complied and/or will have complied with applicable provisions of the Governmental Immunity Act of Utah, U.C.A. § 63G-7-101, *et seq.*

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

A.      Economic and noneconomic damages as provided under applicable law and deemed appropriate by a jury;

B.      Attorney fees and litigation expenses pursuant to 42 U.S.C. § 1988 and as provided under applicable law;

C.      Punitive damages against Defendant Thompson and Defendant Excell as provided under applicable law and to the extent deemed appropriate by a jury;

D.      Costs as provided under applicable law; and,

E.      Pre-judgment and post-judgment interest as provided under applicable law.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all causes of action for which a jury is permitted.

DATED this 8th day of April, 2010.

CHRISTENSEN & JENSEN, P.C.

/s/ Karra J. Porter
Karra J. Porter
Nathan D. Alder
Sarah E. Spencer
*Attorneys for Plaintiffs*

All Plaintiffs' addresses:
In care of CHRISTENSEN & JENSEN, P.C.