# Exhibit "D"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

---

ANNA SCHMIDT CARDALL, *et al*,
    Plaintiffs,

      vs.

KENNETH THOMPSON, *et al.*,
    Defendants.

No. 2:10-CV-00305-CW

Report of Kenneth R. Wallentine

---

The following report of Kenneth R. Wallentine is submitted after review of the following documents, pleadings, records, and reports:

Plaintiffs' complaint

Defendants' initial disclosures

Hurricane City Police Department policies

Hurricane City Police Department TASER® training materials

Hurricane City Police Department training records and certifications

Anna Cardall deposition transcript

Lynn Excell deposition transcript

Kenneth Thompson deposition transcript

Jeff Adams deposition transcript

Merlin Spendlove deposition transcript

Raleigh Morris deposition transcript

Ryan Carter deposition transcript

Washington County Critical Incident Task Force investigation records

Brooksby & Judy in-car video recordings

Various incident scene photographs & diagrams

Interview with Lynn Excell

Kenneth R. Wallentine states as follows:

1.      In the instant matter, I have relied upon the documents, diagrams, pleadings, records, reports, and statements previously described. I have formed a number of opinions based upon the aforementioned, as well as my experience, education, and familiarity with professional publications. I have relied on a variety of professional publications, including, but not limited to, my own publications and court decisions cited therein. Those opinions, and a summary of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows:

a.      **Summary of reported facts and conclusions:**

In early June 2009, Brian Cardall, his wife Anna Cardall and their daughter Ava traveled from their home in Flagstaff, Arizona, to visit family members in Utah and to attend a family wedding in the Salt Lake City area. On the night of June 8, they stayed at the St. George home of Brian Cardall's parents. The Cardalls left St. George late in the morning on June 9 and stopped for lunch at the In-N-Out Burger restaurant in Washington.

Anna Cardall was driving as the family left the restaurant. Brian Cardall began to make comments and ask questions about their destination that concerned his wife. Cardall had

previously experienced a number of mental health crises and Anna Cardall believed that he was entering another crisis situation. She told her husband that she believed that he needed to take some medication. As they traveled on State Route 59 near mile marker 16, just outside the city limits of Hurricane, Utah, Anna Cardall pulled over to a graveled turn-out to give Brian Cardall a combination of four 100 milligram doses of Seroquel. He swallowed the medication.

After Cardall took the Seroquel, he got out of the car. Anna Cardall asked him to get back into the car, but he did not. He later tried to get back in the car, but Anna Cardall had locked him out because she was afraid for their two year-old daughter. Cardall became increasingly irrational and disoriented, ran into the roadway and appeared to attempt to direct traffic. Anna Cardall became alarmed; she knew that she would not be able to handle the situation on her own and she called 911 to summon aid. She reported to the 911 dispatcher that Brian Cardall had been diagnosed as bi-polar and that he "[was] in the middle of the road having a serious psychosis . . . and I'm afraid that he's going to jump in front of a car." She communicated the urgency of the situation, telling the dispatcher, "he's going to get hit," "he's full blown lost it." As the dispatcher was taking information and communicating to emergency medical services, deputy sheriffs and police, several motorists slowed or stopped at the scene. Anna Cardall told dispatchers that Brian Cardall was taking off his clothes. The dispatcher informed the responding officers and paramedics that Brian Cardall was taking his clothes off and that he was trying to jump in front of cars.

Other persons also called the 911 dispatch center. Eric Bishop reported that Brian Cardall shouted something about the end of the world and was very agitated. When Cardall sprinted at him and then ran into traffic, Bishop got back into his vehicle. Clarence Good reported that he

had stopped when he saw Brian Cardall running on the highway, but Anna Cardall told Good to move on. Good drove further and saw that Cardall was chasing him. Good then pulled over and called 911.

The initial information suggested that the event was happening at mile marker 18, which is within Hurricane City limits. Thus, the dispatcher sent Hurricane City Police officers and Hurricane City paramedics. Although the location was later clarified as being outside the city limits, the Hurricane City paramedics and police officers were much closer than other emergency responders and they continued to the scene. Officers and paramedics arrived in the following order (according to the radio log):

| | |
|---|---|
| Officer Thompson | 13:17:47 |
| Chief Excell | 13:17:47 |
| Officer Adams | 13:19:16 |
| Paramedics Spendlove & Carter | 13:19:17 |

Officer Thompson pulled off the road and stopped south of Brian Cardall. Cardall was standing on the edge of the highway when Officer Thompson arrived. Chief Excell passed Cardall and pulled over to the north of him, leaving Cardall's car between the two police cars. Just before the officers arrived, the dispatcher relayed that Brian Cardall was trying to get back into his car, but that his wife did not want him in the car because of the two year-old child. The dispatcher also told the officers that Cardall wanted to meet with the President of the United States and that he was running across the road to direct traffic. Cardall had taken off his shoes and most of his clothes shortly after Anna Cardall first pulled off of the highway. By the time that the officers arrived, Brian Cardall had completely disrobed.

When Officer Thompson got out of his car, he called for Brian Cardall to come to him, away from the edge of the road. He then repeatedly told Cardall to get down on the ground. Chief Excell also shouted several times for Cardall to get down on the ground. Anna Cardall also asked her husband to get down. Brian Cardall told the officers that this was a standoff, and he told them not to shoot. Officer Thompson was dressed in a regular police duty uniform with badge and police patches. Chief Excell was dressed in a soft uniform, with a badge on his belt. Officer Thompson told Brian Cardall that they were police officers and Thompson repeated his command to Cardall to get on the ground. Officer Thompson drew his Advanced TASER® X26 Electronic Control Device.

Brian Cardall turned toward Officer Thompson and ran toward him. Thompson continued to shout at Cardall. When Cardall was approximately five feet from Thompson, Thompson deployed the TASER. The TASER was deployed at 13:19:29, approximately 45 seconds after Thompson and Excell arrived at the scene. The device delivered the two darts into Cardall's front upper torso. Contemporaneously, Thompson notified dispatch of the TASER deployment. The neuromuscular interruption caused by the TASER device effected Cardall and he fell to the ground. Chief Excell advanced toward Brian Cardall.

At the end of the five-second energy cycle, Brian Cardall quickly started to get up again. Officer Thompson shouted at Cardall to stay on the ground. Chief Excell shouted, "stay down, stay down, put your hands behind your back." Officer Thompson re-energized the TASER to deliver a second five-second cycle and once again notified dispatch of the TASER deployment. Officer Thompson gave Chief Excell a pair of handcuffs and Excell handcuffed Brian Cardall.

Officer Thompson told dispatch that the it was safe for the paramedics to approach. Paramedic Carter had watched the TASER deployment and he and Paramedic Spendlove were a short distance away. After Brian Cardall was handcuffed, Officer Adams noted that he did not appear to be breathing and he summoned the paramedics from where they were waiting in their truck a few feet away. They immediately grabbed their equipment and ran over to provide aid to Brian Cardall. He was suffering a cardiac event. Paramedics used a defibrillator and administered cardiopulmonary resuscitation in an effort to stabilize his heart rhythm.

The paramedics continued to administer medical aid to Brian Cardall for a few minutes. They lifted him into a waiting ambulance and took him to the Dixie Regional Medical Center in St. George. Tragically, despite valiant efforts by paramedics and emergency room doctors and nurses, Brian Cardall did not revive.

b. **The use of the Advanced TASER® X26 device to control Brian Cardall was reasonable and was consistent with generally accepted best practices for police at the time of the incident. The risk of injury posed by the application of the TASER X26 device was minimal and was reasonable in consideration of the significant interest in controlling and securing Brian Cardall.**

1. Officer Thompson and Chief Excell arrived at the scene of Brian Cardall's psychiatric event to find circumstances that were tense, uncertain and rapidly evolving. As they drove to the scene, they learned from the dispatcher that they were being sent to deal with a "10-96" (radio code signifying mentally disturbed) man, referred to as "bi-polar" who was "trying to jump in front of cars" and was fully disrobing. The dispatcher also told the officers that Brian Cardall had been

given medication that had not yet taken effect. A short time later, the dispatcher provided added information gleaned from Anna Cardall. The dispatcher told Thompson and Excell that Brian Cardall was trying to get back inside the car, but that the female caller (Anna Cardall) did not want him in the car, communicating that she was fearful for the two year-old child locked in the car. The dispatcher also relayed that Brian Cardall was "out of control" and that he was making apparently delusional statements about meeting with the President. Less than a minute later, the dispatcher stated that Anna Cardall reported that Brian Cardall was "running across the road thinking that he's directing traffic." The officers also knew that they were heading along a heavily-traveled state highway that is the main route to Apple Valley, Hilldale, Colorado City, Fredonia and to recreation areas at Lake Powell, as well as the easiest route to the Navaho Nation and to Flagstaff, Arizona. The speed limit is posted at 65 m.p.h. and large tractor-trailer trucks often drive on the highway at that speed. Thus, the officers should have recognized a substantial threat to Brian Cardall and to the driving public as Cardall ran into traffic on this busy, high-speed, highway just a short distance from a blind curve. The officers also knew that a very short distance across from where the Cardalls were stopped there was a row of concrete Jersey barriers demarking and protecting against a sharp drop-off into a rocky ravine.

2.  Immediately upon arriving at the scene, Officer Thompson saw that Brian Cardall was completely nude and was at the edge of the highway, perhaps about to run into traffic as had been reported to Thompson. A reasonable police officer would

recognize the urgency of controlling Brian Cardall and stopping him from running into traffic. A car traveling at the speed limit and coming around the curve might not be able to stop in time to avoid hitting Cardall if he were in the roadway. A driver might take rapid evasive action and lose control as the driver steered off the pavement. Thus, a reasonable police officer would try to control Cardall as quickly as possible. Officer Thompson shouted to Brian Cardall to "come here" away from the edge of the highway. Closing off the highway and establishing a secure perimeter would have been ideal, but hardly possible in any reasonable time. The total number of officers responding to the call, even including those who arrived much later, still was inadequate to shut down traffic on a busy highway near a curve and on a hill. This is not an uncommon situation; in a relatively rural area, one would not typically find a sufficient number of officers on duty and available to accomplish the task. Not only was there not time to wait for additional back-up officers, there simply were not enough officers readily available to close the highway and create a containment perimeter.

3. Brian Cardall's psychiatric disorientation became even more evident to Officer Thompson and Chief Excell as they heard Cardall make irrational statements about the situation being a stand-off and heard Cardall say "don't shoot him" in a likely reference to Chief Excell and as they saw Cardall step from Thompson's direction toward Excell and then toward Anna Cardall. At this point, both Officer Thompson and Chief Excell were shouting at Brian Cardall to get on the ground.

Anna Cardall was pleading with Brian Cardall to get down and do what the officers were demanding.

4.     A reasonable officer would have recognized by this point that Brian Cardall was in serious psychiatric disorientation. A reasonable officer might well conclude, based on the facts presented to Officer Thompson and Chief Excell, that Brian Cardall was in a state of agitation referred to by the medical diagnosis of "excited delirium." Though there may be various clinical terms applied to this condition, such as agitated delirium, Bell's mania, manic episode, officers are commonly taught about a collection of symptoms including hyperactivity, aggressiveness, incoherent/irrational speech and shouting, disrobing, etc., as "excited delirium." Officer Thompson and Chief Excell had participated in training discussing this condition. The joint research efforts of Dr. Mark Kroll, Dr. Charles Wetli, Dr. Deborah Mash, Dr. Steven Karch, Dr. Michael Graham and Dr. Jeffrey Ho, have produced a list of externally manifested indicators, or symptoms, of excited delirium. The pre-physical contact indicators include: 1, critical reporting party-stated phrases such as, "He just freaked out," "just snapped," "flipped out," or a person is "running around naked;" 2, agitation, screaming, extreme fear response or panic; 3, violence, assault, or aggression towards others; 4, suspicion of impending death, (typical comments include, "I'm dying," "please save me," or "don't kill me"); 5, incoherence or disorganized speech, grunting or animal sounds; 6, clothing removal inappropriate for ambient temperature or complete nudity; 7,

disorientation or hallucinations; 8, mania, paranoia, anxiety, or avoidance behavior; 9, constant motion or hyperactivity.

5.    Most of these factors are commonly presented in lecture and video during TASER training and were presented to Officer Thompson and Chief Excell in the TASER training presented by Detective Raleigh Morris. Thompson and Excell observed Brian Cardall's constant motion and hyperactivity, complete nudity (even though there was a light rain and the day was reported to be unseasonably cool), disorientation or delusions about directing traffic, meeting with the President and the possibility of shooting Chief Excell (suggesting Brian Cardall's possible perception of Excell's impending death), and extreme anxiety. Officer Thompson and Chief Excell saw that Brian Cardall was running in bare feet on small, sharp gravel, with dried twigs on the ground, suggesting that he might be impervious or at least insensitive to pain. Officer Thompson and Chief Excell had also been told that Brian Cardall was "out of control" and that Anna Cardall perceived some risk to their two year-old daughter locked in the car. Officer Thompson and Chief Excell also had been told that Anna Cardall had administered medication, presumably psychotropic medication, to Brian Cardall, an indicator that the psychiatric crisis was severe. Brian Cardall presented with virtually all of the external symptoms listed by the leading scientists and medical clinicians and researchers who have studied excited delirium in recent history. The officers could well expect that one of the other manifestations of excited delirium, abnormal or superhuman strength, would present as they tried to control Brian Cardall.

Enhanced strength and the often-accompanying manifestation of imperviousness to pain are repeatedly presented in TASER training and had been presented by Detective Morris during the TASER training attended by Officer Thompson and Chief Excell.

6.     Over the past few years, police training professionals have devised protocols to help officers deal with persons experiencing excited delirium. There are two vital components to the current best practice protocol for response to excited delirium. First, the responding law enforcement officers should approach the situation as a medical crisis and not a criminal episode. Second, the responding law enforcement officers should, as quickly as possible, *capture*, *control* and *cool* the subject. Cooling is best facilitated by emergency medical personnel. Thus, it is best practice for officers who know or reasonably believe that they are responding to an excited delirium medical crisis to request that emergency medical services be dispatched to the scene. Aware of this specific protocol or not, Officer Thompson and Chief Excell followed it. They tried to capture and control Brian Cardall as expeditiously as reasonably possible and control him. There is not available evidence to determine whether Brian Cardall was hyperthermic to any degree or not. However, the best practices protocol standard was exceeded by having emergency paramedics on the scene at the time of the attempt to control Brian Cardall. Paramedics and firefighters are not trained to contact and control violent and/or disturbed persons and it is common practice for them to stand off a

reasonable distance until law enforcement officers have captured and controlled a person in a state of excited delirium.

7.     Use of an electronic control device, such as the Advanced TASER X26 device, is often indicated in cases of a non-compliant subject who demonstrates a willingness to hurt himself or others. Electronic control devices may provide, under appropriate circumstances, reasonable alternatives to force options that present other risks in the particular circumstances. None of the known contraindications for the TASER X26, such as an obvious pregnancy, elderly/young child, or a flammable environment, were presented by Brian Cardall. Brian Cardall did not appear to be physiologically impaired in any way; to the contrary, he appeared to be very physically strong and fit. Deployment of the TASER X26 was a viable and reasonable option to assist in controlling Brian Cardall.

8.     Unlike other force options, the TASER electronic control device does not depend on pain to achieve compliance, although the person generally experiences pain. The TASER electronic control device relies on loss of neuromuscular control and the ability to perform coordinated action. When discharged from a distance, the TASER X26 uses compressed nitrogen gas to propel two probes which are attached to the X26 by thin wires. If both probes make contact with a person, closing the electrical circuit, the X26 delivers an electric current through the wires into the person. The TASER electronic control device is designed to override the person's central nervous system and incapacitate the person's neuromuscular control. The X26 delivers short, shaped electrical pulses lasting 100 microseconds,

delivering 19 pulses per second for the first two seconds, and then dropping to 15 pulses per second while discharging. Each operation of the X26 delivers approximately 400 volts average (1,200 peak volts), contrasted to as much as 100,000 volts experienced in a strong static electricity shock. The TASER discharge produces a current of 0.00021 amperes into the person's body over the duration of the TASER discharge, or approximately 21/100,000ths of the same amperage of the current required to light a single small Christmas tree bulb. The X26 defaults to a five second discharge for each discharge, although the device operator can manually stop the cycle.

9.     Officers are taught that the general safety of the TASER electronic control device has been well-documented in dozens of peer-reviewed medical and safety studies, as well as the deployment history in numerous public safety agencies. Summaries and conclusions of many of these studies were presented in the TASER training that Officer Thompson and Chief Excell attended. The United States Department of Justice and the United States Department of Defense are among the many government institutions and universities' studies whose independent, peer-reviewed research and analysis has supported the general safety of electronic control devices. Officers are taught that there have been well-over 2,100,000 TASER applications on humans. During a very few of those applications, persons have been injured. On very rare occasions, persons have died after grappling and struggling with the police officers who deployed the TASER to assist in capturing and controlling them. However, officers are also taught that there has never been

a death that has been scientifically demonstrated to have been caused by the application of the TASER device. Officers are trained during TASER X26 user courses that the TASER device is a safer means to capture, control or restrain a person in a possible state of excited delirium because the most significant threat to the person is usually the self-destructive exertion and the TASER device has less negative physiological impact than other force options that are likely to protract the period of struggling and exertion.

10. The TASER electronic control device has a strong history of significantly reducing injuries in law enforcement force applications and in preventing the necessity of more injurious force options, including deadly force. For example, through my work on behalf of the City of Phoenix Police Department and the Maricopa County Sheriff's Office, I am personally familiar with a 67% decrease in suspect injuries and a 54% reduction in deadly force uses in a single year. I have studied research that demonstrates that the use of an electronic control device is far less injurious than other non-lethal force options. In the course of my teaching and research, I have studied the injury rates and use of force tool effectiveness rates of over a dozen major police departments using electronic control devices. Each one reported a reduction in injuries. As electronic control device use increased in departments, the use of more injurious options, such as impact rounds, baton strikes, chemical sprays, dog bites and take downs, decreased and corresponding injury rates decreased. Officers are taught that the TASER device is a viable

alternative to other force options that is both safe and is likely to reduce injuries to officers and the persons that the officers are attempting to control.

11.     A consequence of a discharge of an electronic control device may be that the subject falls to the ground. However, significant injuries from such falls are very unlikely. An epidemiological study conducted by physician researchers at Wake Forest University, Virginia Commonwealth University, Louisiana State University and the University of Nevada, and published by the American College of Emergency Physicians, of approximately 1,000 cases of individuals taken into custody following the use of an electronic control device showed a significant injury rate of 0.5% and a head injury rate (sufficiently serious to require medical treatment) of 0.2%. The large majority of falls, 99.7% of the cases, resulted in no injury or only in minor abrasions or contusions, as was the apparently the case with Brian Cardall. This extremely low rate of significant injuries is consistent with my observation of electronic control device use in the field and in my studies of law enforcement agencies' use of force reports.

12.     One of the possible force options that was not used in this situation, but has been discussed throughout the discovery phase of the litigation, is the use of oleoresin capsicum aerosols, commonly known as "OC" or "pepper spray." Oleoresin capsicum aerosols are intended to temporarily reduce a person's ability to physically resist an officer. Oleoresin capsicum aerosols commonly produce the following results: tearing, involuntary closing or complete closing of the eyes due to dilation of the eye capillaries; eyes may appear red or bloodshot for up to 30 to

60 minutes; immediate mild inflammation of the respiratory system, including swelling of the throat lining which can restrict (but not occlude) the airway size for 10 to 45 minutes; the airway will remain open enough to allow for sufficient oxygen flow; the person will probably not receive enough oxygen to continue fighting or other sustained physical exertion; nasal and sinus draining; temporary paralysis of the larynx and/or coughing, retching, and gasping for air with a gagging sensation in the throat; inflammation of the exposed skin with a burning sensation. One of the most certain effects is the involuntary closing of the eyes. This often happens very quickly, but the effect may be manifested more slowly with some persons, and not manifested in a small number of persons. In many cases, temporarily blinding a person may be a desirable and productive effect of oleoresin capsicum aerosol deployment. The effects of pepper spray on a mentally-disturbed person may vary. However, it would be generally unreasonable and unwise to deploy an oleoresin capsicum aerosol on a psychiatrically-disturbed and disoriented person, adjacent to a busy highway and near a rocky ravine protected by a short wall of Jersey barriers, particularly when officers were told that the person had been running into the highway (which meant running toward the Jersey barriers).

13.    Other control options might have included a multiple-officer takedown, sometimes colloquially referred to as a planned "swarm." This approach is taught as a method of dealing with agitated and/or violent mentally or emotionally disturbed persons. It is more common in correctional institutions. Commonly-accepted

training protocol dictates that no fewer than six officers who are trained in the technique. This allows for one officer to control and isolate each limb, one officer to cradle and protect the person's head, and one officer (preferably two officers) to apply handcuffs and other restraints. There is some controversy associated with the use of this technique with emotionally disturbed persons and it presents risks of injury. A slick or gravel surface is a contraindication for this technique. Not only were there not sufficient officers at the scene, or even likely to arrive at the scene in a reasonable time, this is not a technique commonly taught in Utah. It also may present an increased risk of a cardiac event for a person suffering an excited delirium event. A person who is naked often presents the additional complication of being slick with perspiration.

14.     It would have been unreasonable for two or even three officers to attempt to grapple Brian Cardall to the ground and into restraints. His rapid and hyperactive movements telegraphed the possibility of abnormal strength. Studies and experience show that physical grappling usually involves strikes and punches, often leads to subject and officer injuries at a much higher rate than would be expected with an electronic control device.

15.     Post-incident analysis shows that there was some size disparity between Officer Thompson, Chief Excell and Brian Cardall. However, even assuming that an officer accurately perceives and assesses a significant size disparity, there are a number of other threat factors that should be considered. A reasonable officer might well not perceive a size disparity in a situation of momentary observation of

an apparently well-muscled, quick-moving person.  In fact, a reasonable officer might easily perceive that the person possessed physical strength superior to the officer's strength.  Very often, officers will subconsciously perceive and process these factors in the split-second decision to address tense, uncertain and rapidly evolving situation.  Officers are taught these factors; some may be common sense. Threat factors that an officer should consider go beyond consideration of whether the suspect is armed or assaultive.  Factors to consider when dealing with a mentally disturbed person include such factors as: the person's known or reported history, drug use, the sex/age/body size/perceived strength disparity between the officer and person, the available weapons, verbal threats, non-compliance with the officers' commands, the person's appearance and demeanor, muscle-clenching or jerky muscle movements, whether the person displays an aggressive or combat stance, whether the person has removed jewelry and/or clothing, the person rapidly scanning the area (or holding a "1,000 yard stare"), geographical and terrain factors (rural or urban area, unstable, slick, rocky or steep ground), the number of officers immediately present, crowd/bystander conditions, the available force tools, the ability to obtain sufficient and immediate back-up and physical exhaustion. This is not an exclusive list.

16.  Officer Thompson was required to make a split-second judgment about how best to control Brian Cardall and keep Cardall from running into the road, over the Jersey barriers and into the ravine, or at his wife or some other person.  Officer Thompson had been trained in the prescribed circumstances for TASER

deployment and recognized, as would any similarly-trained and situated reasonable

officer, that the TASER was a reasonable device to assist in rapidly controlling

Brian Cardall. Officer Thompson's perceptions of the risks that Brian Cardall

presented to himself, to the officers and to others at the scene, including Anna and

Ava Cardall, were reasonable perceptions that any reasonable officer would likely

also perceive. Officer Thompson's training taught him that the foreseeable risks of

injuries to Brian Cardall resulting from deployment of the TASER to attempt

neuromuscular incapacitation and the foreseeable secondary risks of deployment of

the TASER were minimal. Officer Thompson reasonably concluded that deploying

the TASER was a reasonable option, consistent with generally-accepted police

best practices.

17. Brian Cardall offered fleeting, transitory compliance with Officer Thompson's and

Chief Excell's commands to get on the ground. Officers completing law

enforcement training in Utah are taught that prone control, colloquially known as

ground control, promises maximum control for persons to be taken into custody.

Brian Cardall did not comply with verbal efforts to facilitate ground control. Chief

Excell described Brian Cardall's responses to his commands to get on the ground

as popping "right back up."

18. Police officers are trained at the police academies across the nation, and

specifically in all Utah police academies, that every physical confrontation where

an officer and a suspect grapple or the officer uses empty hands control tactics at a

close distance (which is *always* the case with empty hands tactics) involves at least

one loaded gun and the possibility of being fatally shot. In the nearly 30 years since I began my law enforcement career, I cannot recall a single year where there were not multiple officers killed with their own weapons that had been taken away in a struggle with a suspect. Most years, officers killed during response to disturbance calls is at the top or toward the top of the list of circumstances in which officers are fatally shot, again some with their own weapons. This is one of the training points that is frequently repeated in initial academy training and in-service training. Officers are taught that maintaining distance whenever possible is a prime safety consideration. Keeping a disturbed or assaultive person away from the officer's firearm is a core principle that is frequently reinforced in training. Any reasonable officer would have recognized that Brian Cardall presented a threat of charging at one of the officers and grappling for the officer's weapon. The almost certain result would have been one or more shooting deaths. Using a TASER device to halt a charge or assault against an officer that could result in a struggle for the officer's gun is a method commonly taught to police officers.

19.     Brian Cardall changed his pace from walking back and forth as he rapidly advanced directly toward Officer Thompson. Officer Thompson believed that Cardall was coming "right at [him]." Based on what he had been told about Brian Cardall's actions before he arrived and what he had seen Brian Cardall do, Officer Thompson believed that Brian Cardall was a threat to him and that he was in danger. Chief Excell also believed that Officer Thompson was in danger as Cardall moved toward Thompson. Chief Excell stated that if Officer Thompson would

have waited another "millisecond," Brian Cardall would have been "on him." Paramedic Spendlove reported that Cardall was running at Officer Thompson. When Cardall closed the distance to approximately five feet from him, Thompson fired the TASER cartridge. This act was consistent with what a reasonable police officer would have done under like circumstances. The TASER probes struck Brian Cardall in the chest. At least some neuromuscular incapacitation resulted and Brian Cardall fell to the ground. The TASER cycle ran the full course of five seconds.

20. Chief Excell began to advance toward Brian Cardall to securely control him. Prior to the TASER deployment, Chief Excell had been keeping a safe distance as a reasonable officer is trained to do. Immediately at the end of the TASER cycle, Brian Cardall began to get back up. Officer Thompson yelled at Brian Cardall to "stay on the ground, stay down." When he got to his knees, Officer Thompson re-activated the TASER for another cycle. This was a reasonable step to continue neuromuscular incapacitation as Chief Excell moved to secure Brian Cardall. It was also a reasonable step to energize the TASER as Cardall was getting up in order to minimize the risk that Brian Cardall would fully rise up and fall again during the second TASER cycle. Chief Excell moved in as quickly as he could to secure Brian Cardall in a pair of handcuffs supplied by Officer Thompson. A reasonable officer would have acted as quickly as possible to apply handcuffs, including handcuffing while the TASER cycle was still active.

21.     Officer Thompson's deployment of the TASER on Brian Cardall was witnessed by paramedics. Officer Thompson and Chief Excell were taught, as is consistent with best police practices, to summon medical assistance when dealing with a psychiatric event in which a TASER device might be used. Paramedics were already on the scene and able to quickly respond and provide a high level of field trauma care. Chief Excell and Officer Adams acted reasonably in summoning the paramedics from a few feet away and did just what a reasonable officer in like circumstances would have done.

c.      **The Hurricane Police Department properly trained Officer Thompson in the use of the Advanced TASER X26 device and adopted policies for its use that were consistent with generally accepted best practices for police at the time of the incident.**

1.      Officer Thompson was certified to use the TASER X26 at the time of this incident. He was trained to generally-accepted professional training standards and was required to complete the examination prescribed by TASER International and that is in use in thousands of law enforcement agencies in the United States, Canada, several other nations and in the United States military services. He had successfully completed TASER X26 recertification training and passed an examination on February 5, 2009.

2.      Officer Thompson successfully completed basic police academy training and had maintained the requisite in-service training hours (no fewer than 40 hours per year, much higher than the number of hours required for most licensed professionals)

each year for many years. He was trained to the level of a reasonable police officer working in the state of Utah. His selection as a School Resource Officer is evidence of his professional skills and the regard in which the Police Department held toward him. Police departments typically select from the very best officers to serve in public schools, looking for officers with intelligence, common sense, restraint and an affable personality.

3.  Officer Thompson was acting under a Hurricane Police Department policy that was harmonious with recommended best practices and was consistent with prevailing TASER use policies in force at the time, and followed by many other police departments, military services, sheriffs' offices and state law enforcement agencies in the United States. The policy provisions included advisement to consider other force options when controlling a person, to consider the force offered by the person and whether the officer or others could suffer injury from the person's actions, and to consider the size and demeanor of the person to be controlled and the likelihood of injury from some physical force. The Hurricane Police Department provided a copy of this policy to Officer Thompson and trained him in its provisions. That training is consistent with police best practices.

4.  On June 9, 2009, the prevailing practice in law enforcement across the United States was to train officers to target the center of a person's mass when presented with a frontal target. This facilitated uniformity with the long-standing instruction for use of a firearm and impact projectile weapons and was premised largely on the increased likelihood of a successful deployment when an officer aimed at a larger

*Cardall v. Thompson et al.*
*Report of Kenneth R. Wallentine*          23

mass. Officer Thompson was taught this targeting practice during the TASER training provided by the Hurricane Police Department.

**d.** **Chief Excell properly supervised Officer Thompson during the deployment of the Advanced TASER X26 device and attempt to control Brian Cardall.**

1. As an administrator, Chief Excell did not commonly carry a TASER device. However, he had been certified as a TASER operator for many years and was currently certified on June 9, 2009. Thus, he was familiar with both the Hurrican Police Department TASER use policy and the prescribed uses of the TASER X26 device.

2. Chief Excell recognized the factors described about and knew that it was vital to rapidly control Brian Cardall. Chief Excell observed that Officer Thompson acted under tense, uncertain and rapidly evolving circumstances to reach a decision about a method to quickly control Brian Cardall that was reasonable and was consistent with training and policy. Accordingly, Chief Excell did not observe any actions by Officer Thompson that Excell should have prevented or any directions from Thompson that Excell should have countermanded.

2. In reaching my opinions in this matter I have relied upon my training and experience in public safety acquired throughout my career. My qualifications, publications, litigation history and fee schedule are recited herein.

3. **My qualifications as an expert in this subject matter include the following:** I am a law enforcement officer in the State of Utah. My primary employment is for the Utah Attorney General, where I serve as the Chief of Law Enforcement. I was formerly employed as a Bureau

Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah, and supervised the police service dog training and certification program. I also had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety. I was certified as a law enforcement officer in the State of Utah in 1982. My duties include direct supervision and command of three Investigation Sections, supervising approximately thirty-five law enforcement officers, forensic specialists, and technicians, as well as a dozen of part-time peace officer employees. I command the State of Utah Child Abduction Response Team. I command the State of Utah Officer-Involved Fatality Investigation Team. I am a member of the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations. In 2010, Governor Herbert selected me for the 2009 Governor's Leadership in Public Service award for my work in public safety leadership.

4.      I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy. I continue to teach at the Utah Law Enforcement Academy. I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability. I regularly teach in the Basic Training programs of the Utah State Police Academy. I regularly teach in the following

specialized courses: Advanced Officer Course, Firearms Instructor Course, Utah Drug Academy, Utah Crime Scene Investigators Academy, Utah Sheriffs' Association Command College, First Line Supervisor Course, POST K9 Unit Administrator Course, POST Patrol Dog Handler Course, POST Narcotics Detector Dog Course, and others. I am a former police service dog handler and worked with the Uintah County Sheriff's K9 Unit from 1995 to 2001. I continue to provide instruction and evaluation services for the POST Police Service Dog program. I am a certified POST Firearms Instructor, often serving as the lead instructor for POST Firearms courses. I am certified by the Force Science Research Center as a Force Science Analyst. I am a certified TASER Instructor. I am a certified Excited Delirium and Sudden Death Investigation Instructor. I was certified by the Los Angeles Police Department in Officer-Involved Shooting Investigation.

5.      I am a licensed attorney, having practiced law since 1990. I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah. I am a Master of the Bench of the American Inns of Court, Inn One, where I also serve as the past-President of the Inn of Court. I serve as an Administrative Law Judge for the State of Utah and for various counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities. I am on the adjunct faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management Strategies for Public Safety and am responsible for course design and curriculum selection for Criminal Procedure.

6. In addition to my primary employment, I occasionally consult and provide expert witness opinions on police procedures, and use of force issues. I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise. I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police pursuit policies. I am the co-founder of, and legal advisor to, a best practices advisory group that developed comprehensive model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs' Association and various state law enforcement agencies. These policies serve as a model for all Utah public safety agencies. I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise. I am the author of a number of model policies for law enforcement agencies, and have provided policy drafting and policy review services for several agencies, including policy drafting responsibility for large law enforcement agencies. I am a program and grant reviewer for the Office of Justice Programs, United States Department of Justice. I have also served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

7. I participate and serve in a number of community and professional capacities. I am a member of the Scientific Working Group on Dog and Orthogonal Detector Guidelines, a national scientific best practices organization sponsored by the Federal Bureau of Investigation, the Department of Homeland Security, and the Transportation Security Administration, with support coordinated by the International Forensic Research Institute at Florida International University.

Other professional activities pertinent to law enforcement include serving as a Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, member of the International Association of Law Enforcement Educators and Trainers Association, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, member of the International Association of Law Enforcement Firearms Instructors, member of the International Association of Directors of Law Enforcement Standards and Training, member of the International Law Enforcement Educators and Trainers Association, member of the K9 Section of the Utah Peace Officers Association, member of the United States Police Canine Association, past member of the board of directors of the NAACP, Salt Lake City branch, and board member and immediate past-Chairman of the Utah Law Enforcement Legislative Committee. I formerly served as a gubernatorial appointee to the Council on Peace Officer Standards and Training. I currently frequently serve as a member *pro tempore* of the Council on Peace Officer Standards and Training.

8.     Since 1994, I have been a consultant with the K9 Academy for Law Enforcement and the International Police Canine Conference. My principal responsibilities are to provide use of force training, civil liability instruction, and search and seizure instruction. In the past year, I have provided police service dog training and certification standards consultation for two police service dog organizations, including a western regional group and one of the major national groups. I serve as a consultant for the California Narcotic and Explosive Canine Association and have been a featured lecturer at their annual training conference over the past decade.

9.      I am a Senior Legal Editor for Lexipol, Inc., the nation's largest provider of policy

formulation and revision for public safety agencies and policy-based training, responsible for

reviewing and editing the work of legal staff in creation of policy manuals for law enforcement

agencies.  In that capacity, I have assisted in the drafting and review of use of force and electronic

control device policies in current use by more than 1,000 police agencies in the United States.

10.     **My publications (limited to ten years) include the following:**  I have previously

published a number of other professional articles, many of which have been subjected to peer

review.  My most recent book, *The K9 Officer's Legal Handbook,* was published by Lexis/Nexis

Matthew Bender in December 2008.  It includes an extensive discussion of use of force by police

officers.  Another recent book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police,*

*Prosecutors, and Defenders,* was published in 2007 by the American Bar Association Publishing

Division.  It is a treatise on public safety and criminal procedure, and includes multiple chapters

on search and seizure and use of force by police officers.  My other published works, limited to

the past ten years, include:  *Cell Site Location Evidence: A New Frontier in Cyber-Investigation,*

2011 (2) AELE Mo. L. J. 501,  *Prospects, Pitfalls and Pains of Social Media and Public Safety,*

The Municipal Lawyer, September 2010; *Police Department May Read Text Messages Sent on*

*Agency-issued Pagers: City of Ontario, California v. Quon,* Police Chief, August 2010;

*Collection of DNA Upon Arrest: Expanding Investigative Frontiers,* Police Chief, January 2010;

*Targeting TASER: The New TASER Aim Points,* Law Officer, January 2010; *The Risky*

*Continuum: Abandoning the Use of Force Continuum to Enhance Risk Management,* The

Municipal Lawyer, July 2009; *Explosive Detector Dog Legal Issues,* K9 Cop, February 2009;

*Does Police Service Dog Deployment Equal Deadly Force?,* K9 Cop, April 2009; *Human Scent*

*Line-up Evidence*, Police K9 Magazine, August 2009; *Acknowledging Gender in Fitness Standards for Police: An Invitation to Liability?*, The Municipal Lawyer, January 2008; *K9 Court Testimony*, Police K9, December 2006; *United States Supreme Court Review for Corrections Managers*, Corrections Managers Report, October 2006; *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005); *Conduct Unbecoming an Officer*, The Municipal Lawyer, January, 2005; *Limits on Off-Duty Police Employment*, The Municipal Lawyer, Spring 2004; *Conjugal Prison Visits*, Corrections Manager, March, 2003; *Life in the Law* (BYU Press 2002), co-author; *Investigating In-Custody Death*, Corrections Manager Report, October 2002; *Police Canine Risk Management*, The Municipal Lawyer, July 2002; *The New Paradigm of Firearms Training*, IADLEST News, Spring 2001; *Use of Deadly Force Instructor Curriculum* (monograph), POST, Spring 2001; *Pepper Spray as Use of Force*, Police, October 2000; *Are Drug Courts the Wave of the Future?*, Police, April 2000; and a variety of columns addressing law enforcement issues and published by PoliceOne.com. I am the author of a reference book currently in use in the Utah Law Enforcement Academy, as well as other police academies throughout the United States, titled *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005). This book discusses detention and arrest of persons, use of force, and search and seizure of persons and property, among other subjects.

11.     **My fee schedule is established as follows:** I charge $250.00 per hour for examination of reports and documents, site visits, interviews, administrative tribunal, deposition or court testimony. I bill for actual travel expenses and an additional travel time fee of $1,000.00 per day for travel to western states and $1,500.00 per day outside western states.

12.     **My prior experience as an expert witness (limited to the past four years) includes the following cases:** I have been qualified as an expert in the subject matter of police procedures, including use of TASER® devices, excessive force, shootings and wrongful death claims, search and seizure, police service dog use, both in drug detection and dog bites, and I have never had a court decline to find that I am a qualified expert witness. I have testified and/or provided depositions and trial testimony in the following cases which may be generally related to the subject of the instant litigation in the past four years: *Krause & Martin v. Manalapan Township*, Case No. 3:09-CV-0287, United States District Court of New Jersey, 2010. Deposition testimony given on behalf of defendant. Subject matter: police canines. *Mitchell v. Dow*, Case No. 2:08-CV-00726-DB, United States District Court of Utah, 2010. Trial testimony given on behalf of defendants. Subject matter: excessive force. *Al-Asadi v. City of Phoenix, et al.*, No. 2:09-CV-00047, United States District Court of Arizona, 2010. Deposition testimony given on behalf of the defendants. Subject matter: excessive force and propriety of an arrest. *United States v. Beltran-Palafox*, No.09-40022-01/02 JAR, United States District Court of Kansas, 2010. Trial testimony given on behalf of the plaintiff. Subject matter: search and seizure. *United States v. Trestyn & Herren*, No. 09-CR-00216-B, United States District Court of Wyoming, 2010. Trial testimony given on behalf of the plaintiff. Subject matter: search and seizure. *United States v. Ludwig*, No. 08-CR-00224-D, United States District Court of Wyoming, 2009. Trial testimony given on behalf of the plaintiff. Subject matter: search and seizure. *Evans v. Taylorsville City*, Case No. 2:06-CV-00631 TS, United States District Court of Utah, Central Division, 2009. Deposition testimony given on behalf of the defendants. Subject matter: improper execution of search warrant, negligent investigation. *Swofford v. Eslinger*, Case No.

6:08-CV-00066-PCF-DAB, United States District Court of Florida, Orlando Division, 2009. Deposition testimony given on behalf of the defendants. Subject matter: improper search and excessive force. *Becker v. Bateman*, Case No. 2:07-CV-311 PGC, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: excessive force. *Salva v. Kansas City Board of Police Commissioners*, Case No. 07-CV00194-JTM, United States District Court of Missouri, Western Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: Wrongful death. *Turnbow v. Ogden City et al.*, Case No. 1:07-CV-114, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: Wrongful death. *Nielson v. South Salt Lake City & Burnham*, Case No. 2:06-CV-335, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: sexual misconduct. *Trammell v. Jacksonville Beach City Police Department*, Case No. 3:06-CV-984-J-16MMH, United States District Court of Florida, Jacksonville Division, 2008. Deposition testimony given on behalf of the plaintiffs. Subject matter: excessive force. *Harman & Overton v. Utah Department of Public Safety,* Case No. 2:03CV00558TC, United States District Court of Utah, Central Division, 2007. Deposition testimony given on behalf of the defendants. Subject matter: wrongful search, negligent investigation.

The observations and opinions stated herein are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process. They are based on the best information presently known to me. I have assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with physical

evidence, that were provided to me. The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony, consideration of any report submitted by plaintiff's experts, and further investigation. I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or video and photographs.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned documents.

## CONCLUSION

By any measurement and any consideration in the clarity of hindsight, the death of Brian Cardall following his acute psychiatric crisis is profoundly sad and tragic. It is evident that Cardall was a bright and caring man, very much loved by those who knew him well. Plainly, all involved would want a different outcome.

The officers who were called to assist with Brian Cardall's acute psychiatric crisis made reasonable decisions based on their training and experience. The use of the Advanced TASER® X26 device to control Brian Cardall was reasonable and was consistent with generally accepted best practices for police at the time of the incident. The Hurricane Police Department properly trained Officer Thompson in the use of the Advanced TASER X26 device and adopted policies for its use that were consistent with generally accepted best practices for police at the time of the incident. Chief Excell properly supervised Officer Thompson during the deployment of the Advanced TASER X26 device in the attempt to control Brian Cardall.

Kenneth R. Wallentine
March 3, 2011

Kenneth R. Wallentine
5272 South College Drive, Suite 200
Murray, Utah 84123