# Exhibit 19

# Deposition of
# Ken Wallentine

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ANNA SCHMIDT CARDALL, individually, and as representative of the estate of BRIAN LAYTON CARDALL, and as guardian of AVA CARDALL and BELLA CARDALL, DUANE CARDALL, individually, and MARGARET CARDALL, individually, <br><br> Plaintiffs, <br><br> v. <br><br> KENNETH THOMPSON, in his individual capacity, LYNN EXCELL, in his individual capacity, and HURRICANE CITY, a Utah Municipal Corporation, and JOHN and JANE DOE, <br><br> Defendants. | Case No. 2:10-cv-00305-CW <br><br> DEPOSITION OF: KENNETH R. WALLENTINE <br><br> TAKEN: May 3, 2011 <br><br> Judge Clark Waddoups |

    Deposition of KENNETH R. WALLENTINE, taken on behalf of the Plaintiffs, at the offices of offices of Christensen & Jensen, 15 West South Temple, Suite 800, Salt Lake City, Utah, before Jill C. Dunford, Certified Shorthand Reporter in and for the State of Utah, pursuant to Notice.

1  or an interview and has given a deposition.  I assume you
2  have read those?
3       A.  Yes.
4       Q.  But for all you know, Officer Thompson could
5  have tased Brian Cardall because he feared for his life
6  or he could have tased Brian Cardall because Brian
7  violated a PMO or COC statute?  Fair statement?
8       A.  A fair statement would be that I don't know
9  what was in Officer Thompson's mind when he chose to
10 deploy the Taser.
11      Q.  You have used in your training of officers
12 the phrase "PMO" or "COC statute"?
13      A.  I'm familiar with what you mean.
14      Q.  And "PMO" meaning?
15      A.  Pissing me off.
16      Q.  And "COC" meaning?
17      A.  Contempt of cop.
18      Q.  And you have trained officers -- or you have
19 acknowledged to officers when you have given training
20 that on occasions officers engaged in certain conduct
21 because a subject violated a PMO statute or a COC
22 statute, correct, as you called it?
23      A.  That's a general statement that I wouldn't
24 necessarily agree with.  A more fair statement would be
25 that I in the context of training Fourth Amendment

```
 1   advised officers that their conduct will be judged under
 2   a specific -- and I usually talk about the case -- rubric
 3   and that PMO and COC and had a bad day or caught a whiff
 4   of pepper spray aren't part of that equation.
 5        Q.   When you say "aren't part of that equation,"
 6   you mean are not legitimate reasons to use force,
 7   correct?
 8        A.   Correct.
 9        Q.   You are not here to tell us or the jury
10   whether it would have been reasonable for Officer
11   Thompson to tase Brian Cardall five or ten minutes
12   earlier, correct?
13        A.   Earlier than the Taser was deployed?
14        Q.   Yes.
15        A.   Correct.
16        Q.   You agree, don't you, that reasonableness of
17   the deployment is judged by facts known or reasonably
18   believed to be true by the officer at the moment the
19   force is used?
20        A.   I believe that that is a fair statement.
21   Moment might -- I would probably express it similarly to
22   that, yes.
23        Q.   In fact, you did in those exact words in your
24   Turnbow deposition.
25        A.   Okay.
```

1  threat?

2      Q.  Yes.  I think you said -- let's just go back
3  and have your answer read so you will know exactly what
4  I'm asking you.

5      (The record was read by the court reporter.)

6      Q.  Then you also agreed that one could conclude
7  that he was not, right?

8      A.  Sure.

9      Q.  What conduct immediately prior to the
10 deployment were you referring to?

11     A.  His conduct?

12     Q.  Yes.

13     A.  His act of charging rapidly towards Officer
14 Thompson.

15     Q.  That is an assumption that you made, correct?

16     A.  That is correct.

17     Q.  In fact, it is a -- you have not stated any
18 opinion in your report that is not based on the
19 assumption -- let me try asking this in English.  I
20 withdraw, strike, wish I had never spoken those last
21 fumbling words.  So shall it be.

22     I'm trying to ask a question that isn't going to
23 extend five pages in the deposition.

24     A.  Sure.

25     Q.  You have assumed for purposes of the opinions

1  in your report that Brian Cardall was charging Officer
2  Thompson at the time of the first deployment, correct?
3       A.  Yes.
4       Q.  You have stated no opinions -- if a jury
5  concludes that Brian was not charging Officer Thompson at
6  the time of the deployment, you have stated no opinions
7  in your report as to the reasonableness of the
8  deployment, correct?
9       A.  I'm not -- if a jury concludes that that
10 wasn't happening, no, I haven't addressed that.
11      Q.  That's what I thought.
12          Okay.  Let's go back to this sort of third Graham
13 factor that you referenced in the quote that I read.
14          Third, was the subject actively resisting arrest
15 or attempting to escape?  Apply that factor for us.
16      A.  In this case, Brian had been given several
17 instructions to get down on the ground, to stay down on
18 the ground, so that the officers could -- and again, we
19 have used the word arrest here, because in this context,
20 I understand that you are quoting from Graham versus
21 Connor, in which the court purported to -- or the court
22 established a yardstick of conduct measurement for force
23 used in the context of arresting a person, which is why
24 Graham and I have used the word "arrest" and recognize
25 the possibility that there were other times that force

```
 1   casually walking.  He was moving quickly.
 2          Q.   Describe that more for me.
 3          A.   People had described that he had run in and
 4   out of traffic.
 5          Q.   That was before the officers got there,
 6   right?
 7          A.   Right, circumstances were rapid.
 8          Q.   I'm talking about once the officers got
 9   there, at no time after the officers got there did Brian
10   run into the roadway, correct?
11          A.   I believe that's correct.
12          Q.   So I'm talking about the circumstances --
13   well, let me ask you this:  Would it have been reasonable
14   for Officer Thompson to tase Brian the moment he got out
15   of his car?
16          A.   It would not have been reasonable to deploy
17   the Taser at that point.
18          Q.   So something changed.  Something changed to
19   make it reasonable in your opinion, correct?
20          A.   Yes.
21          Q.   What changed after he got there that made it
22   reasonable or is it the alleged running at Officer
23   Thompson?
24          A.   That's certainly -- that's the major factor
25   right there.
```

1 the record.

2 And then I basically asked you some questions
3 about what changed. I think you said that primarily what
4 changed was the charging or the running or you had words
5 to that effect.

6 Was there something else that changed that you
7 have assumed that made it reasonable for Officer Thompson
8 now to tase Brian?

9 A. I'm not clear when you say something else has
10 changed. Can you --

11 Q. Has it? Okay, you agree with me, and I
12 believe you testified earlier that it would have been
13 unreasonable for Officer Thompson to tase Brian as soon
14 as Officer Thompson got out of the car. Correct?

15 A. Correct.

16 Q. So here we are in the pullout area. Officer
17 Thompson has gotten out of his car. At that point, he
18 should not be tasing Brian. But yet you have concluded
19 that 42 seconds later it was okay, it was reasonable for
20 Officer Thompson to tase Brian, correct?

21 A. Yes.

22 Q. So I'm asking you to please identify for me
23 everything that changed from when it was unreasonable, if
24 he had tased Brian, to make it reasonable.

25 A. Okay. Now I think I'm tracking where your

```
 1   questions are going.
 2          Officer Thompson at the point that he deployed
 3   the Taser perceived that Brian Cardall --
 4       Q.  You know what?  I'm happy to have you answer,
 5   but are you telling me what's that he did perceive or an
 6   assumption that you made?  See the distinction here,
 7   right?
 8       A.  I do.
 9       Q.  Do you mind going ahead and answering the
10   question -- I can have it read back -- making clear that
11   these are assumptions?
12       A.  Okay, I am assuming -- I am assuming that
13   Officer Thompson's report that he perceived that Brian
14   Cardall was charging at him was accurate.
15          I am also assuming that these other factors that
16   are reported in here in terms of the condition of the
17   roadway and all that is true.
18          But the primary issue here for me in my mind the
19   reasonableness for the deployment of the Taser is that
20   Officer Thompson, I assume, that he accurately reports
21   that he perceived that Brian Cardall was charging at him.
22       Q.  Have you ever testified in other cases that
23   officers under stress sometimes experience a condition
24   known as hyperarousal and their memory becomes inaccurate
25   of the events that occurred?
```

1          Likelihood of injury to whom?
2          A.   Either party.  Actually may I say any party.
3          Q.   Okay.  Did you see evidence in this case that
4    Officer Thompson, in fact, considered the likelihood of
5    injury from some physical force?
6          A.   I don't recall that I saw that mentioned in
7    his discussion.
8          Q.   Now, would you agree with this statement:  "A
9    great policy is worthless if officers are not trained in
10   constitutional limitations on the use of force and the
11   parameters of the agency's policy.  How many agencies
12   require firearms qualification two or more times each
13   year but never provide training on the latest court
14   decisions or statute changes that govern use of force?"
15         A.   Did I write that?
16         Q.   I'm just asking if you agree with the
17   statement?
18         A.   I do, but I think I wrote it.
19         Q.   I think you did.
20         A.   I do agree with it.
21         Q.   It's in that -- it's mentioned in that
22   article that we marked already.
23         A.   Yes, I do.
24         Q.   Now, what evidence, if any, did you find that
25   Officer Thompson had been trained in constitutional

1  limitations on the use of force?
2       A.  I know that that's part -- there's an
3  encapsulation with that within the Taser training.
4       If the -- I'm now making an assumption that's not
5  in the record.  I'm not sure if that's fair.
6       Okay, there are requirements that that training
7  be presented annually in Utah to police officers.
8       Q.  Training on constitutional limitations on the
9  use of force?
10      A.  Yes.
11      Q.  So if the City was doing its job with respect
12 to training, you would expect that Officer Thompson
13 received such training?
14      A.  Yes.
15      Q.  Okay.  Did you see any --
16      A.  I'm sorry.  I may have seen that in the
17 training documents.  I'm not recalling at this moment.
18 But if it's in there, I saw it.
19      Q.  What evidence, if any, did you see that
20 Officer Thompson had received training on the latest
21 court decisions that governed use of force?
22      A.  I didn't see anything in the file that told
23 me that he had actually been at that training.
24      Q.  If Hurricane City had an unwritten policy of
25 allowing officers sole discretion in deciding which

1   option with respect to force to employ in a particular
2   circumstance without any limitations, would that be a
3   reasonable policy?
4           A.  No.
5           Q.  A couple of cleanups, things that we referred
6   to a little bit earlier now we have the file back.
7           A.  Okay.
8           Q.  First let me ask you, on page 17 of your
9   report which is Exhibit 60, page 17, paragraph 14, in the
10  second sentence of paragraph 14 you state, "His" --
11  meaning Brian's -- "rapid and hyperactive movements
12  telegraphed the possibility of abnormal strength."
13          Did Officer Thompson ever at any point mention
14  any fear or perception that he had that Brian Cardall had
15  abnormal strength?
16          A.  I don't believe so.
17          Q.  So that's a possibility that you came up with
18  after the fact, correct?
19          A.  I believe -- I don't think I saw anything in
20  the record.
21          Q.  We talked this morning in the deposition
22  about what I think I referred to as the Graham analysis
23  or the Graham factors.
24          Do you remember generally our discussion?
25          A.  I do.

1 couple of steps in one direction, a couple of steps in
2 another direction, and a couple of steps in another
3 direction. As I said before, I don't recall the order.
4 But I think he moved toward his wife, toward Chief
5 Excell, and toward Ken Thompson.
6     Q. So each of those movements was active
7 noncompliance?
8     A. Sure. Yes. In the context of not being
9 responsive to the command.
10    Q. Although not being responsive to the command
11 is itself noncompliance, right?
12    A. It is. Fair enough.
13    Q. By the way, whose interview summary refreshed
14 your recollection?
15    A. Mark Prklacich.
16    Q. No, the officer, who was being interviewed.
17    A. Thompson.
18    Q. So if all Brian had done was just continued
19 to move in that pattern, a few steps here, a few steps
20 this way, would it have been reasonable for Officer
21 Thompson to tase him?
22    A. I don't believe so.
23    Q. If a person, a subject is not compliant but
24 is not an imminent threat to anyone, reasonable to tase
25 him?

1    A.    I can't answer a question that broadly other
2    than to give you a broad general proposition of no.
3    There's still important stuff.
4         Q.    There is?
5         A.    Yeah, I'm worried that your person will be --
6              MR. ALDER:    Ken, I'm going to personally take
7    you to your vehicle.
8         Q.    (BY MS. PORTER)    Let me ask you -- let me
9    read you a statement and ask you if you agree with it.
10   I'll just be totally up front.    I am reading this --
11        A.    Did I write it?
12        Q.    No.    I'm reading this from Casey versus City
13   of Federal Heights, Tenth Circuit Opinion from 2007.
14   Again, I'm just reading the statement and you tell me
15   yea, nay, or whatever.
16             "It is excessive to use a Taser to control a
17   target without having any reason to believe that a lesser
18   amount of force or a verbal command could not exact
19   compliance."
20        A.    I agree generally with that statement of law
21   as applied to the facts in that case.    Did you say
22   Federal Heights?
23        Q.    What?
24        A.    Is this near Denver?    Is this Colorado?
25        Q.    It's Colorado, yeah.    But you know the Tenth