IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ANNA SCHMIDT CARDALL et al.,<br><br>Plaintiffs,<br><br>v.<br><br>KENNETH THOMPSON et al.,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No.  2:10-cv-305 CW<br><br>Judge Clark Waddoups |

Defendants have filed a Motion for Summary Judgment, asking that the court rule in their favor on all Plaintiffs' claims.  After a careful review of the record, and for the reasons explained below, summary judgment is GRANTED in part and DENIED in part.

Plaintiffs' Complaint lists seven causes of action.  The First Cause of Action alleges that Defendant Kenneth Thompson ("Thompson") deprived both Brian and Anna Cardall of their constitutional rights.  The Second Cause of Action brings the same claims against Defendant Lynn Excell ("Excell").  The Third Cause of Action maintains that Hurricane City and Chief Excell are liable for any unconstitutionality in Brian Cardall's tasing or Anna Cardall's detention because they were done in accordance with the city's policies and training.  These first three claims are brought by Anna Cardall for herself and on behalf of her deceased husband.  The Fourth Cause of Action, brought by Anna Cardall on behalf of Brian Cardall, states Thompson, Excell, and Hurricane City all violated the Utah State Constitution.  The Fifth Cause of Action, against Thompson and Excell, states that they are liable to Anna Cardall for intentional infliction

of emotional distress.  The Sixth Cause of Action is a claim of wrongful death against Thompson

for tasing Brian Cardall, and the Seventh Cause of Action is a claim of wrongful death against

both Thompson and Excell for failing to provide medical assistance to Brian after the incident.

These final two claims are brought on behalf of all Plaintiffs.[1]

　　　　For the reasons given below, the First, Second, and Third Causes of Action are partially

dismissed, insofar as they pertain to Anna's detention.  Plaintiffs' Seventh Cause of Action is

also dismissed.  As to the remainder of the claims, however, summary judgment is precluded by

disputed issues of material fact.

## FACTS

　　　　On June 9, 2009, Plaintiff Anna Cardall, together with her husband Brian Cardall and

their two year old daughter Ava Cardall, was driving through Washington County.[2]  Brian had

been diagnosed with bipolar disorder,[3] and when he began acting strangely Anna pulled over to

---

[1] The plaintiffs in this case are Anna Cardall, Brian's wife; Ava and Bella Cardall, Brian's children; and Duane and Margaret Cardall, Brian's parents.

[2] As all Plaintiffs and the decedent share the same last name, they will be referred to throughout this opinion by their first names.  No disrespect is so intended.

[3] Plaintiffs object to references to Brian's "bipolar" diagnosis in Defendants' briefs, arguing that such references are made without foundation and are not relevant.  *See* Memo in Supp. of Mot. to Strike at 9, Dkt. No. 60 (July 14, 2011).  Plaintiffs are correct that the medical records Defendants relied on to support their allegation that Brian was diagnosed with bipolar disorder are inadmissible hearsay.  *See Field v. Trigg County Hosp., Inc.*, 386 F.3d 729 (6th Cir. 2004) ("[T]he hearsay exception set forth in Fed. R. Evid. 803(4) applies only to statements made by the one actually seeking or receiving medical treatment.); *Bombard v. Fort Wayne Newspapers*, 92 F.3d 560 (7th Cir. 1996) ("Rule 803(4) does not purport to except, nor can it reasonably be interpreted as excepting, statements by the person providing the medical attention to the patient."); *Bulthuis v. Rexall Corp.*, 789 F.2d 1315 (9th Cir. 1985) ("Rule 803(4) applies only to

the side of the road to give him some medication from the trunk.  Brian took the medication, but refused to get back in the car and began taking off his clothes.  Eventually, Anna called 911.

The 911 operator sent a dispatch out to law enforcement.  Officer Thompson and Chief of Police Excell, both of the Hurricane City Police Department, responded to the call.  En route, they were told by dispatch that the situation was "psychiatric."  Transcript of Ken Thompson Recorder ("Thompson Recorder") at 13, Exhibit 26 to Memorandum in Opposition to Summary Judgment, Dkt. No. 64 (July 14, 2011) ("Memo in Opp. to SJ").  They were further informed that "[t]he male is trying to get back in the vehicle and the female does not want him back in the vehicle because there's a two-year-old.  Advising he's out of control, talking about meeting with the president" and that "he keeps running cross the road, thinking that he's directing traffic." *Id.* at 13–14.

Officer Thompson and Chief Excell arrived on the scene at approximately the same time.  Thompson was in a semi-marked police car and was wearing a uniform, while Excell was in an unmarked car and was wearing a polo shirt with a small police insignia.  Neither officer had a

_____

statements made by the patient to the doctor, not the reverse.").  However, Defendants also relied on deposition testimony from Anna Cardall to support their allegation that Brian was diagnosed as bipolar.  *See* Memo in Supp. of Mot. for Summ. J. at 6, Dkt. No. 43 (June 13, 2011).  While Anna is not qualified as an expert to testify that Brian did in fact have bipolar disorder, she can testify that she believed that he had such a disorder or a similar disorder, and that she gave him medication for such.

The court makes reference to Brian's bipolar disorder in order to give context to the relevant facts that follow.  The court makes no finding of fact that Brian was, in fact, bipolar.  If the parties believe this fact is relevant to the claims at issue in this case, they will need to support the allegation that Brian Cardall had bipolar disorder with additional admissible evidence.

dash cam, but Thompson was wearing an audio recording device.  Both Thompson and Excell

weighed approximately 200 pounds at the time, Defendants' Answers to Plaintiffs' First Set of

Written Discovery at 4, Exhibit 34 to Memo in Opp. to SJ, while Thompson estimated Brian

Cardall weighed 150 pounds, Deposition of Raleigh Morris at 44–45, Exhibit 12 to Memo in

Opp. to SJ.

      When the officers arrived, Brian was completely naked and standing in the turnout where

Anna had parked.  After initially telling Brian to "come here," Thompson told Brian to get down

on the ground thirteen times.  *Id.* at 16–17.  Excell also repeatedly told Brian to get down.  *Id.*

Brian kept turning from Thompson to Excell to Anna.  According to Thompson, "[Brian] would

go down on his knees and then he would get back up and then down on his knees and then back

up.  He did that several times.  And then walking back and forth between all of us."  Interview

with Kenneth Thompson at 13, Exhibit EE to Notice of Filing Additional Exhibits in Support of

Defendants' Motion for Summary Judgment, Dkt. No. 51 (June 13, 2011) ("Additional

Exhibits").  From Brian's comments it appears that Brian believed that Thompson intended to

harm Excell, and Brian begged him not to shoot.  Transcript of Taped Proceedings at 5, Exhibit

D to Reply to Response to Motion for Summary Judgement, Dkt. No. 74 (Aug. 22, 2011)

("Reply to SJ") (although the transcript misidentifies the speaker as a police officer, both parties

agree that it was Brian Cardall who stated "This is a standoff.  Don't shoot him" and "Standoff.

Don't shoot him, guys.").

      What happened next is subject to conflicting eyewitness accounts.  Anna testifies that

Brian turned towards Thompson as though he were about to say something, and Thompson tased

him.  Deposition of Anna Cardall at 104–05, Exhibit 6 to Memo in Opp. to SJ.  A passing driver

stated that Brian took "one small step" towards Thompson prior to the tasing.  Deposition of

Lorry Stratton at 18, Exhibit O to Memorandum in Support of Motion for Summary Judgment,

Dkt. No. 43 (June 13, 2011) ("Memo in Supp. of SJ") .  Officer Thompson and Chief Excell,

however, have stated that Brian "charged" at Thompson, closing the distance between them very

quickly, and that Thompson was forced to deploy the taser in self-defense.[4]  *See* Interview of

Officer Ken Thompson at 14, Exhibit B to Reply to SJ; Interview of Chief Lynn Excell at 18,

Exhibit A to Reply to SJ.  In any event, it is uncontroverted that Brian was tased approximately

42 seconds after Officer Thompson's first command to Brian, Defendants' Answer at 8, Dkt. No.

10 (May 7, 2010), and that Brian was not given a warning about the taser prior to its deployment,

Deposition of Kenneth Bailey Thompson at 48, Exhibit E to Memo in Supp. of SJ; Thompson

Recorder.

      According to its internal log, the taser was deployed for the full five second cycle.  Some

of the witnesses report that Brian began to immediately get up, but another states that he

remained prone.  *Compare* Deposition of Kenneth Bailey Thompson at 52, Exhibit E to Memo in

Supp. Of SJ ("[H]e was getting up.  He was still a threat.") *and* Deposition of Lynn Excell at 59,

Exhibit 9 to Memo in Opp. to SJ ("Brian got up at least on one knee or both knees starting to

---

[4] Because virtually all of the evidence, including the vehicles and the confetti-like tags dispersed
by the taser upon firing, was moved before the investigative team arrived, there is no physical
evidence indicating how far Brian was from Thompson when he was tased.  A bloodstain on the
gravel indicated, however, that Brian was twenty feet from the edge of the road when he fell to
the ground.  Redfearn Site Sketch and Measurements, Exhibit 33 to Memo in Opp. to SJ.

stand back up") *with* Deposition of Lorry Stratton at 10, Exhibit 17 to Memo in Opp. to SJ

("[O]nce he went down he didn't move. He was laying there."). Two seconds after the end of

the first tasing, Thompson deployed the taser for another five second cycle. Excell then

handcuffed Brian, which took several seconds. Immediately after the handcuffing, one of the

officers radioed the paramedics, who had arrived at the scene during the time of the first tasing

and were parked in the same turnout where the tasing occurred. Before the paramedics reached

Brian, a third officer who had just arrived noticed that Brian was not breathing and did not have a

pulse. The paramedics worked on Brian at the scene and then transported him to a nearby

hospital, where he was pronounced dead.[5]

     Almost immediately following the tasing, Anna called Duane Cardall, Brian's father, to

inform him of the incident. While Officer Thompson stood nearby, Nate Brooksby, an officer

from the Washington County Sheriff's Office, told Anna to hang up her phone. Officer

Brooksby then, while in the presence of both Thompson and Excell, instructed Deputy Judy of

Washington County to escort Anna to the county sheriff's office for an interview. Thompson and

Excell said nothing, and Judy asked Anna if she would mind coming down to the police station

with him. Anna complied, following Officer Judy in her own vehicle. Once she arrived, she was

kept waiting with her toddler for nearly an hour, was not allowed to have visitors, and was not

informed that her husband had died until after the interviews had concluded.

---

[5] This statement of facts includes those facts that were known to the defendants prior to and at
the moment Brian was tased. Defendants have offered additional facts that were not known to
the defendants until later. The court has sustained Plaintiffs' objection to those facts and
disregarded them in this analysis.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."  *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003).  A fact is "material" if it is "essential to the proper disposition of the claim."  *Id.*  The court views the evidence in the light most favorable to the non-moving party, as "evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in the [non-movant's favor]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## ANALYSIS

### I.    § 1983 AND QUALIFIED IMMUNITY

Defendants have argued that the First and Second Causes of Action should be dismissed on grounds of qualified immunity, insofar as they assert a cause of action under § 1983 for the use of excessive force against Brian Cardall.  Qualified immunity insulates government officials from personal civil liability as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  After the defendant contends that qualified immunity applies, the plaintiff must prove that the defendant violated his rights, as protected by clearly established law.  *V-1 Oil Co. v. Wyoming*, 902 F.2d 1482 (10th Cir. 1990).  Although the burden shifts to the plaintiff, the court must continue to view the facts in the light most favorable to the non-moving party.  *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010).

In order avoid having her claims barred by qualified immunity, Anna must show that Thompson and Excell's activity was unconstitutional and that this unconstitutionality was clearly established at the time it occurred.  As explained below, if the facts are viewed in the light most favorable to Anna, the officers' actions violated the Fourth Amendment.  Furthermore, as of June 2009, it was clearly established that this use of excessive force was unconstitutional.

A.     **Excessive Force**

When police officers are sued for using excessive force, the constitutionality of their conduct under the Fourth Amendment is evaluated under the *Graham* analysis.[6]  Under this analysis, the inquiry is whether the officers' actions were objectively reasonable as judged from the perspective of a reasonable officer on the scene, recognizing that officers are often forced to make split-second decisions and should not be held to the exacting scrutiny of hindsight. *Graham v. Connor,* 490 U.S. 386, 396–97 (1989).  Only that information which was known to the officers at the time is examined in making this determination.  *See Weigel v. Broad*, 544 F.3d 1143, 1152 (10th Cir. 2008).

Under *Graham*, the court should assess the "nature and quality of the intrusion on the individual's Fourth Amendment interests" and the "countervailing governmental interests at stake."  *Id.* at 396.  This is an inquiry which involves consideration of the specific facts, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the

---

[6] As Defendants have conceded that Brian Cardall was "seized" at the time of the tasing, there is no need for the court to analyze Thompson and Excell's behavior under the Fourteenth Amendment in addition to the Fourth Amendment *Graham* analysis.

safety of the officers or others, and whether he is actively resisting arrest or attempting to evade

arrest by flight." *Id.* The Tenth Circuit has also stated that "a detainee's mental health must be

taken into account when considering the officers' use of force . . . under *Graham*." *Giannetti v.

City of Stillwater*, 216 Fed. Appx. 756, 764 (10th Cir. 2007).

   In evaluating the "nature and quality of the intrusion on the individual's Fourth

Amendment interests" caused by a tasing, the number and length of electric shocks given to the

subject is generally relevant. Within the Tenth Circuit, however, *any* use of a taser constitutes a

severe intrusion on the interests protected by the Fourth Amendment. *Cavanaugh v. Woods

Cross City*, 625 F.3d 661, 665 (10th Cir. 2010) (internal quotations and citations omitted)

("Officer Davis's weapon of choice was a Taser—a weapon that sends up to 50,000 volts of

electricity through a person's body, causing temporary paralysis and excruciating pain. Although

Tasers may not constitute deadly force, their use unquestionably seizes the victim in an abrupt

and violent manner. Accordingly, the nature and quality of the intrusion into the interests of Ms.

Cavanaugh protected by the Fourth Amendment was quite severe.").[7] In Brian's case, he was not

only tased, but tased twice, each time for the full cycle permitted by the device. The injuries

allegedly caused by the tasing, which included cardiac arrest, were clearly severe. The tasing was

_____

[7] The court recognizes that neither the district court nor the Tenth Circuit had decided
*Cavanaugh* until after Brian Cardall's death, and so the case did not put Defendants on notice
that such use of force is unconstitutional. Nevertheless, *Cavanaugh* illustrates how the *Graham*
factors apply to tasings in this jurisdiction, and it is therefore helpful for the first part of the
qualified immunity analysis, in which the court must determine whether Brian Cardall's
constitutional rights were potentially violated during the incident.

a significant intrusion upon his Fourth Amendment interests and is only permissible if justified by the countervailing government interests.

When weighing the government's interests in a tasing, courts primarily look to the factors listed in *Graham*: the severity of the crime being committed, the threat posed by the suspect to himself, officers, or other individuals, and whether the subject is actively resisting arrest.  Within the Tenth Circuit, the subject's mental health is relevant.  *Giannetti*, 216 Fed. Appx. at 764. Case law on tasings from the Tenth Circuit also stresses the importance of whether a warning was given before the use of the taser.  *Casey v. City of Federal Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007) ("The absence of any warning—or of facts making clear that no warning was necessary—makes the circumstances of this case especially troubling"); *Cavanaugh v. Woods Cross City*, 1:08-cv-32, 2009 WL 4981591, at *4 (D. Utah Dec. 14, 2009) (stating "the presence of an adequate warning and opportunity to comply voluntarily is crucial" before deploying a taser).  This opinion will evaluate each of these factors in turn.

The first *Graham* factor is the severity of the crime being committed by an individual before the tasing.  Defendants have listed three crimes which they believe Brian was committing or had committed: Endangerment (a class A misdemeanor), Disorderly Conduct for recklessly obstructing vehicular traffic (a class C misdemeanor or infraction, depending on the circumstances), and Interference with an Arresting Officer (a class B misdemeanor).  Each of these are relatively minor offenses and Brian was not endangering drivers or obstructing traffic at the time he was tased, twenty feet from the side of the road.  Although he only partially obeyed commands to "get on the ground," Brian was confused, apparently believing that Thompson

-10-

intended to hurt Excell, and he was never told he was under arrest.  An individual can only be found guilty of interfering with an arresting officer if they know or should have known that a police officer was "seeking to effect a lawful arrest or detention of that person."  Thus, not only are the crimes which Defendants have identified far from "severe," but Brian's behavior at the time of the tasing was not clearly illegal.

The second, and "most important," of the *Graham* factors is the threat posed by the subject.  *Mattos v. Agarno*, 661 F.3d 433, 441 (9th Cir. 2011).  In this case, this is heavily dependent on disputed facts.  If Brian suddenly charged at Officer Thompson in a violent manner, then he may have posed a threat to the police and there would be considerable justification for the tasing.  If, on the other hand, Brian simply turned towards Thompson, or was taking a few steps in various directions as he had been since the officers arrived on the scene, then he was not a threat.  Brian was a considerable distance from the road, and did not verbally threaten the police, himself, or his family.  He was naked and clearly unarmed, and outnumbered by the officers on the scene, who significantly outweighed him and were about to be joined by additional backup.  If the facts are viewed in the light most favorable to Anna's claim, then Brian did not pose a threat.

Finally, *Graham* requires consideration of whether the subject was actively resisting arrest.  Brian was obviously confused and was not told that he was under arrest.  He started to get down on one knee several times in response to the officers' commands.  Thompson did not identify himself as a police officer until seconds before using the taser, and Excell never

informed Brian that he was a member of law enforcement.  Furthermore, there is no evidence to show that Brian, naked and on foot, was a flight risk.

Brian's mental health also weighed against the use of a taser.  The officers knew that they were responding to a psychiatric situation, and Brian's behavior once they arrived on the scene confirmed that he was not in an ordinary mental state.  In addition to the Tenth Circuit's comments about mental health and excessive force in *Giannetti*, 216 Fed. Appx. at 764, other court decisions have stressed that an officer should hesitate to deploy a taser when the subject is incoherent and he does not appear to understand the officers' commands.  *See Bryan v. MacPherson*, 630 F.3d 805, 812 (9th Cir. 2010); *Estate of Mathis*, 2009 WL 1033771 (D. Colo. 2009).  This principle is premised on recognition that "[t]he problems posed by an unarmed, emotionally distraught individual who is creating a disturbance are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal. . . . In the former instance, increasing the use of force may exacerbate the situation."  *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001).

Finally, Brian was not warned that he would be tased, either the first or second time.  He was repeatedly told to get on the ground and, after he was tased the first time, to stay down.  However, he was not warned that Officer Thompson had a taser and was intending, at any point, to deploy it.  If Brian was tased for simple noncompliance, as Anna's version of the facts suggests, it would have been reasonable for Thompson to warn Brian about the taser before deploying it.  The officers did not attempt to engage Brian in conversation and deployed the taser less than a minute after arriving on the scene.

-12-

The only undisputed fact that weighs in favor of Thompson's decision was that Brian was erratic and agitated, making his behavior somewhat more unpredictable than that of a typical citizen. However, unless he were charging towards Officer Thompson, which is a disputed issue of material fact, the government's interests did not outweigh the violent intrusion on Brian's Fourth Amendment rights effectuated through the tasing.

**B.      Clearly Established**

Even if the decision to tase Brian was unconstitutional, summary judgment on the basis of qualified immunity is still appropriate if the unconstitutionality of the tasing was not "clearly established" at the time of the events, on June 9, 2009. In order for a principle to be clearly established, it must be set forth by the Tenth Circuit or Supreme Court, or the weight of authority from other cases must support it. *Casey*, 509 F.3d at 1284 (quoting *Medina v. City & Cnty of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). "*Graham's* general proposition is not enough to turn all uses of excessive force into violations of clearly established law [because] the fact that it is clear that any unreasonable use of force is unconstitutional does not mean that it is always clear *which* uses of force are unreasonable." *Casey*, 509 F.3d at 1284 (internal quotations, citations, and alterations omitted) (emphasis in the original).

Particularly in the excessive force context, however, qualified immunity analysis is not merely "a scavenger hunt for prior cases with precisely the same facts." *Casey*, 509 F.3d at 1284

-13-

(internal citation omitted). "The more obviously egregious the conduct . . . , the less specificity is required from prior case law to clearly establish the violation. Thus, when an officer's violation of the Fourth Amendment is particularly clear from *Graham* itself, we do not require a second decision with greater specificity to clearly establish the law." *Id.* at 1284. As explained above, if disputed facts are taken in Anna's favor, the *Graham* factors almost universally weighed against taser deployment and the tasing was without lawful justification. Heeding the Tenth Circuit's recent warning that generalized principles should not be excessively relied upon to support a qualified immunity analysis, however, this court will undertake a more fact-specific inquiry. *See Kerns v. Bader*, --- F.3d ----, No. 09-2273, 2011 WL 6367728 at *16–7 (10th Cir. Dec. 20, 2011).

The court did not identify a Tenth Circuit case, or case from any jurisdiction, involving the tasing of a mentally ill individual who was confused and reluctant to obey officers' commands to get down on the ground. The Tenth Circuit, however, has held that "it was clearly established on December 8, 2006 that [an officer] could not use his Taser on a nonviolent misdemeanant who did not pose a threat and was not resisting or evading arrest without first giving a warning." *Cavanaugh*, 625 F.3d at 667. It is true that, unlike the plaintiff in *Cavanaugh*, Brian Cardall was given an opportunity to comply with police demands before being tased. Taking the facts in favor of Anna, however, Brian was a nonthreatening misdemeanant who was not resisting arrest and had no warning he might be tased.

Authority from other jurisdictions concords. The Eighth Circuit, citing *Casey*, has held "it is clearly established [as of October 2005] that force is least justified against nonviolent

-14-

misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security

of the officers or the public." *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009)

(denying qualified immunity to officers who tased a woman after she repeatedly disobeyed their

instructions to get off the phone with a 911 operator). In the Sixth Circuit, judges determined

that by 2006 it was clearly established that officers, during a fight which had broken out at a

wedding, could not tase an individual for refusing their commands to hang up his phone and get

out of his truck. *Kijowski v. City of Niles*, 372 Fed.Appx. 595, 601 (6th Cir. 2010).

Brian was tased although he was not guilty of any serious crime or attempting to flee. If

all factual disputes are resolved in favor of Anna, Brian was not a threat to the officers who

impatiently tased him when, in his confusion, he was slow to comply with their demands. Tenth

Circuit case law, as well as authority from other jurisdictions, explicitly holds that tasings under

similar circumstances violated clearly established Fourth Amendment law.

Defendants' argument that they did not use excessive force or violate clearly established

law rests upon their version of the facts. If the facts are taken in the light most favorable to the

non-moving party, excessive force was used in violation of clearly established law. As a result,

the court will not grant summary judgment on the basis of qualified immunity.

## II.    § 1983 AND MUNICIPAL LIABILITY

Plaintiffs' Third Cause of Action asserts that Hurricane City, and Chief Excell as a

policy-making employee, are liable because the tasing was a municipal deprivation of Brian's

constitutional rights. The Supreme Court has held that a municipality cannot be held vicariously

liable for its employees' actions in a § 1983 suit, and that liability only attaches when the

municipality itself *caused* the constitutional violation. *Monell v. Social Servs. of New York*, 436 U.S. 658, 691 (1978). A municipality can cause unconstitutional behavior by failing to adequately train employees, or by adopting unconstitutional policies, whether written or informal.

The plaintiff must additionally show that the unconstitutional policy or training was the result of "deliberate indifference" to constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 391 (1989). This requires an "obvious" risk that a constitutional violation might occur because of the deficient policies or training. *Id.* at 390. Under this standard, municipalities cannot be held liable under § 1983 for negligent use of unconstitutional policies. Instead, the use must be reckless, knowing, or deliberate. *Dodds v. Richardson*, 614 F.3d 1185, 1196 n.4 (10th Cir. 2010). Thus, in the absence of a "pattern of unconstitutional behavior," a municipality may not be found deliberately indifferent unless the "violation of federal rights [was] a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998).

Anna has argued that Hurricane City failed to adequately train its officers on excessive force, taser use, and mental health issues. She cannot point to a single constitutional violation, other than those alleged in this case, which may have arisen from Hurricane City's training deficiencies. At the same time, however, those deficiencies were arguably obvious. The evidence suggests that Hurricane City provided absolutely no training to its law enforcement on mental health issues. This is particularly troubling in light of the Tenth Circuit's recognition that mental health is an important factor to evaluate when determining the appropriate use of force.

-16-

Anna also argues that Hurricane City's established policy on taser use was unconstitutional both because it left too much discretion to officers and also because it authorized unconstitutional tasings.  Case law from this court states that a policy "in which officers were trained to use only their own subjective judgment when firing a taser" would be unconstitutional.  *Cavanaugh v. Woods Cross City*, 1:08-cv-32, 2009 WL 4981591 at *5 (D. Utah Dec. 14, 2009).  Although deposition testimony by Hurricane City officers mentions that officers were instructed to rely on their "discretion" in determining when to deploy their tasers, it is clear that the exercise of this discretion was dependent on the situation and the subject's actions.  Deposition of Ken Thompson at 72–73, Exhibit 18 to Memo in Opp. to SJ; Deposition of Shane Copland at 65, Exhibit 8 to Memo in Opp. to SJ.  Such a policy, which recognizes that a broad array of factors affect what level of force is appropriate in a given situation, is not unconstitutional.

There is evidence, however, to support Plaintiffs' argument that the policy was unconstitutional because it authorized unconstitutional use of force.  Deposition testimony states that Hurricane City policy allowed the use of a taser when an individual was simply not responding to an officer's verbal commands.  Deposition of Shane Copland at 62, Exhibit 8 to Memo in Opp. to SJ.  If this assertion is true, the policy may have been deliberately indifferent to the *Graham* standard.  Furthermore, Defendants have stated that the tasing of Brian was fully in compliance with city policy.  *See, e.g.*, Deposition of Lynn Excell at 14, Exhibit G to Memo in Supp. of SJ.  If the facts are taken in favor of Anna, this means that the policy authorized the

almost immediate and repeated tasing of a nonthreatening and confused individual, which would be plainly unconstitutional.

Furthermore, even in the absence of an unconstitutional written or established policy, a municipality may be held liable for actions of a policy maker.

> [T]he [Supreme] Court added that "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly."  Accordingly, a municipality is responsible for *both* actions taken by subordinate employees in conformance with preexisting official policies or customs *and* actions taken by final policymakers, whose conduct can be no less described as the "official policy" of a municipality.  This must include even actions by final policymakers taken in defiance of a policy or custom that they themselves adopted.

*Simmons v. Uintah Health Care*, 506 F.3d 1281 (10th Cir. 2007) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)) (internal quotations omitted) (emphasis in the original). Excell, as Chief of Police, was responsible for Hurricane's police policies.  Therefore, to the extent that he authorized the tasings by Thompson, the city may be held liable for his decision.

Hurricane City must remain a party to the case.  Viewing the evidence in a light most favorable to Anna, the city's policy on tasing and trainings on mental health and tasers may have been constitutionally inadequate.  Furthermore, if Excell, the final policymaker for the Hurricane police, allowed or encouraged the use of excessive force, the city can be held responsible for that action.

## III.    FAILURE TO INTERVENE IN ANNA CARDALL'S DETENTION

In the Tenth Circuit, law enforcement officials have a clearly established "affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law

enforcement officers in their presence."  As that court explained, "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . that a citizen has been unjustifiably arrested [or] any constitutional violation has been committed by a law enforcement official."  *Hall v. Burke*, 12 Fed. Appx. 856, 861 (10th Cir. 2001).  Relying on this precedent, Anna argues that Officer Thompson and Chief Excell should have prevented her from being taken to the police station for questioning, because this violated her Fourth Amendment rights.

Defendants respond that when Anna went to the Sheriff's Office she did so willingly, and thus her initial detention was not unlawful.  Consensual encounters with police officers do not implicate the Fourth Amendment, and it is "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen [that] a 'seizure'" occurs. *Florida v. Bostick*, 501 U.S. 429, 434 (1991).  If the encounter was consensual, then Thompson and Excell did not have reason to believe that Anna's Fourth Amendment rights were violated and cannot be held liable for failing to intervene.

The standard for determining whether an encounter with a police officer is consensual is not whether a person preferred to speak with the officer, but whether he or she had "an objective reason to believe that he or she [was] not free to end the conversation with the officer and proceed on his or her way." *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996).  In other words, "[a] consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer." *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000).  An officer need not affirmatively inform the individual that

she has a right to leave the scene in order for the encounter to be consensual. *Id.* at 1176–77. Furthermore, although "most citizens will respond to a police request, the fact that people do so . . . hardly eliminates the consensual nature of the response." *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984).

Officer Judy testified that he understood Officer Brooksby's request to escort Anna Cardall to the sheriff station as an order. Deposition of Elwyn Judy at 16, Exhibit OO to Additional Exhibits. However, Officer Judy did not command Anna to accompany him. Instead, after some conversation with Anna about her daughter and husband, he said "The game plan for right now is we're going to get us off of the highway. It's a little safer. If you don't mind, I'm going—do you mind following me? We're going to head back to the Sheriff's Office and we'll get you guys rest and get a drink and kind of unwind a little bit. And they'll keep you posted on his situation." Transcript of Dash Cam Audio of Officer BJ Judy at 13–14, Exhibit F to Reply to SJ. Anna gave no indication that she was unwilling to comply with his request. Before leaving the scene, Officer Judy again asked "[D]o you mind following me down there and then we'll—like I said, we'll get you off of the highway and then we'll keep you posted . . . . All right?" *Id.* at 14. Anna responded "Okay." *Id.* She then followed Officer Judy, in her own vehicle, to the Sheriff's Office.

Throughout the conversation, Officer Judy's choice of words conveyed the message that Anna's compliance with his request was not required, and he explicitly offered her the opportunity to decline his request. Anna does not suggest that Judy was verbally or physically coercive. Indeed, there is no evidence of any reason Anna would have felt she must accompany

-20-

him other than the ordinary sense of duty most citizens have to comply with the requests of uniformed police officers.

At some point, Anna may have been held without her consent. She was confined for an extended period of time with her young daughter and was not allowed to leave the room, even when she asked to do so, or visit with a family member who came to the office to see her. This did not occur in the presence or with the knowledge of any of the defendants, however, and they cannot be held liable for failure to intervene at this point. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' claims that Officer Thompson, Chief Excell, or Hurricane City interfered with Anna Cardall's constitutional rights.[8]

## IV. STATE CONSTITUTIONAL CLAIMS

Plaintiffs' Fourth Cause of Action states that Defendant's conduct violated Article I, §§ 1, 7, 9, and 14 of the Utah Constitution. These provisions establish a right to life and liberty, prohibit unreasonable seizures, and provide that those being arrested have a right to be free from unnecessary rigor.[9]

Defendants have moved for summary judgment on Anna's claims under the Utah Constitution, stating that money damages are only an appropriate remedy for state constitutional violations when the plaintiff suffered a 'flagrant' violation of his constitutional rights. The test

---

[8] These claims, along with the claims that Brian Cardall's tasing was an unconstitutional use of excessive force, are found in Plaintiffs' First Cause of Action, with respect to Thompson, Second Cause of Action, with respect to Excell, and Third Cause of Action, with respect to Hurricane City.

[9] Defendants have not argued that the state constitutional claims are precluded by the federal constitutional claims, and so at this point, the court will not consider the extent to which, if any, the claims may overlap.

measuring the flagrance of a state constitutional violation is the same test which determines

qualified immunity under § 1983. *Jensen v. Cunningham*, 250 P.3d 465, 482 (Utah 2011). If

facts are taken in the light most favorable to the Plaintiffs, then the tasing flagrantly violated

Brian Cardall's rights under the Utah Constitution, just as the use of force violated his clearly

established rights under the United States Constitution.

## V.   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In the Complaint, Anna Cardall brings a claim for intentional infliction of emotional

distress (IIED) against Defendants Thompson and Excell for causing the death of her husband

while she watched.[10]  In Utah, plaintiffs who bring a claim for infliction of emotional distress

must show that the defendant acted "(a) with the purpose of inflicting emotional distress, or, (b)

where any reasonable person would have known that such would result; and his actions are of

such a nature as to be considered outrageous and intolerable in that they offend against the

generally accepted standards of decency and morality." *Samms v. Eccles*, 358 P.2d 344, 347

(Utah 1961). Not all injuries, torts, or illegal actions, even those which are intentional or

malicious, constitute outrageous acts. *Franco v. The Church of Jesus Christ of Latter-day Saints*,

21 P.3d 198, 207 (Utah 2001). "Generally, the case of intentional infliction of emotional distress

is one in which the recitation of the facts to an average member of the community would arouse

---

[10] Under current Utah law, a person, such as Anna, may recover on grounds of intentional infliction of emotional distress for actions directed toward another person, such as Brian, particularly if that person was present at the time of the outrageous conduct. *See Hatch v. Davis*, 102 P.3d 774, 786–87 (Utah 2004).

his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Walter v. Stewart*, 67 P.3d 1042, 1048 (Utah App. 2003) (internal quotations, citations, and alterations omitted).

Again, the validity of this claim rests upon a disputed issue of material fact. If Thompson and Excell, less than a minute after arriving on the scene, decided to tase a naked, harmless, and confused Brian Cardall as he peacefully stood with his hands raised, then their behavior was not only unconstitutional, but also potentially outrageous. Though killing Brian was clearly not Officer Thompson's objective, deploying a taser without cause recklessly creates the risk of emotional distress. Case law from other jurisdictions which use the same "extreme and outrageous" standard supports this conclusion. *See Ciampi v. City of Palo Alto*, 790 F.Supp.2d 1077 (N.D. Cal. 2011) (denying summary judgment for IIED claim arising from an unprivileged tasing); *Garcia v. City of Imperial*, No. 08cv2357, 2010 WL 3834020 (S.D. Cal. Sept. 28, 2010) (same); *Russ v. Causey*, 732 F. Supp. 2d 589, 607–08 (E.D.N.C. 2010) (denying defendants' motion for summary judgment on an IIED claim brought by individuals who saw their family member lawfully tased during a funeral); *Campos v. City of Merced*, 709 F. Supp. 2d 944 (E.D. Cal. 2010) (stating that if a tasing may have constituted excessive use of force, it follows that the question of whether it was intentional infliction of emotional distress should also go to the jury).

Anna must also show that Defendants' actions proximately caused her severe emotional distress. *Prince v. Bear River Mut. Ins. Co.*, 56 P.3d 524, 535 (Utah 2002). Defendants have pointed out that Anna was calm *at some points* after she saw her husband's tasing and death. At most, this raises a question of disputed fact as to the extent of Anna's distress.

Taking the facts in favor of the Anna, a jury could find Defendants' actions to have been outrageous and caused severe emotional distress.  Therefore, summary judgment is not appropriate on Anna's intentional infliction of emotional distress claim.

## VI.   WRONGFUL DEATH - TASING

Under Utah's Governmental Immunity Act, police officers and municipalities cannot be held liable for torts arising out of the use of force unless "the employee acted or failed to act through fraud or willful misconduct."  Utah Code Ann. § 63G-7-202.  "Willful misconduct" is defined as "the intentional doing of a wrongful act, or the wrongful failure to act, without just cause or excuse, where the actor is aware that the actor's conduct will probably result in injury." Utah Code Ann. § 63G-7-102.

If Brian was not a danger to anyone when he was tased, then a reasonable jury could characterize the tasing as an intentional wrongful act without just cause.  Indeed, Defendants have not argued otherwise.  Defendants do dispute, however, that a police officer would be aware that the use of a taser, which only rarely causes death or even moderate bodily harm, would "probably result in injury."  Plaintiffs respond that tasing causes pain, and that pain is a type of injury.  Furthermore, Plaintiffs argue that Thompson would have known that use of the taser would result in Brian's skin being broken by the metal barbs and would probably cause Brian, who was unclothed, to suddenly drop onto the gravel with no ability to break his fall.

In *Cavanaugh v. Woods Cross City*, 1:08-cv-32, 2009 WL 4981591 (D. Utah Dec. 14, 2009), Judge Campbell held that "because [Plaintiff] was standing on concrete steps, a reasonable jury could find that [the defendant officer] knew that [Plaintiff] could be severely

injured if he tasered her."  It is true the potential injury posed by falling onto concrete steps, such as the brain injury the plaintiff in *Cavanaugh* suffered, is more severe than the potential injury foreseeably caused by falling onto gravel, even fully unclothed.  Nevertheless, the fact that Thompson knew the taser would cause Cardall pain and force him to drop onto the gravel meant that he was aware that his conduct "would probably result in injury."  Tasers constitute an "abrupt," "violent," and "severe" intrusion.  *Cavanaugh*, 625 F.3d at 665.  The court therefore determines that if a taser is deployed without just cause or excuse, its use may constitute "willful misconduct" under Utah's Governmental Immunity statute.

## VII.   WRONGFUL DEATH - LACK OF MEDICAL ASSISTANCE

In a separate claim, Plaintiffs allege Defendants committed a tort when they failed to provide medical care to Brian after he was tased.  Defendants state that there was no evidence of willful misconduct and Governmental Immunity applies.  Again, under Utah's Governmental Immunity Act, police officers and municipalities cannot be held liable for torts arising out of the use of force unless "the employee acted or failed to act through fraud or willful misconduct." Utah Code Ann. § 63G-7-202.  "Willful misconduct" is defined as "the intentional doing of a wrongful act, or the wrongful failure to act, without just cause or excuse, where the actor is aware that the actor's conduct will probably result in injury."  Utah Code Ann. § 63G-7-102.

The facts are not disputed.  There was an ambulance on scene, which provided aid within two minutes of the first tasing.  The audio recording establishes that immediately after handcuffing Brian, the officers radioed "1082, medical is clear to enter."  Thompson Recorder at 18.  The officers also physically signaled the paramedics to leave the ambulance.  Deposition of

Robert Merlin Spendlove at 19, Exhibit NN to Additional Exhibits.  The paramedics reached

Brian shortly afterward and immediately began working to revive him.

    These circumstances provide "just cause or excuse" to Thompson and Excell for not

initiating CPR, and bars the Plaintiffs' claim.  Although, in retrospect, it would have been better

if Thompson and Excell had checked Brian's pulse or rolled him onto his back, no reasonable

jury could find that the officers were guilty of "willful misconduct" for failing to provide medical

assistance while they were being approached by paramedics better equipped and trained for the

job.  Therefore, summary judgment is entered on behalf of Defendants for Plaintiffs' Seventh

Cause of Action.

## **CONCLUSION**

    For the reasons discussed above, Defendants Motion for Summary Judgment[11] is

GRANTED in part and DENIED in part.[12]  Judgment is entered in favor of the Defendants on

---

[11]  Dkt. No. 42 (June 13, 2011).

[12] Plaintiffs have also made a motion to strike several references to allegedly inadmissible
evidence in Defendants' briefs.  While Plaintiffs are correct that the court is only permitted to
consider admissible evidence when considering a motion for summary judgment, new revisions
to the Federal Rules of Civil Procedure have made clear that a motion to strike such evidence is
unnecessary.  Fed. R. Civ. P. 56(c)(2) advisory committee note of 2010 ("Subdivision (c)(2)
provides that a party may object that material cited to support or dispute a fact cannot be
presented in a form that would be admissible in evidence. . . . There is no need to make a
separate motion to strike.").  Rather than granting Plaintiffs' motion to strike, the court has
treated it as an objection and disregarded any evidence relied on by Defendants that it finds to be
inadmissible.  *See Jones v. Barnhart*, 349 F.3d 1260, 1270 (10th Cir. 2003) (internal quotations
and citation omitted) ("[B]ecause it is impractical to strike a submitted affidavit, the court may
simply ignore inadmissible evidence rather than strike the affidavits."); *Stevens v. Water Dist.
One*, 561 F. Supp. 2d 1224 (D. Kan. 2008) ("[T]he court ordinarily does not strike affidavits, but
simply disregards those portions that are not shown to be based upon personal knowledge or

Plaintiffs' First, Second, and Third Causes of Action to the extent that such claims seek relief

against Defendants for alleged violations of Anna Cardall's constitutional rights.  Judgment is

also entered in favor of the Defendants on Plaintiffs' Seventh Cause of Action because the claim

is barred by the Utah Governmental Immunity Act.  Summary judgment is DENIED on all other

claims.

       DATED this 11th day of January, 2012.

                BY THE COURT:

                Clark Waddoups
                United States District Judge

---

otherwise do not comply with Rule 56(e).").